**UNITED STATES of America, Appellee,**

**v.**

**Earl Samuel STUART and Jerome Olen Hayden, Appellants.**

**Nos. 90–5201MN, 90–5215MN.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1990.

Decided Jan. 16, 1991.

John P. Sheehy, and Daniel M. Scott, Minneapolis, Minn., for appellants.

James E. Lackner, Minneapolis, Minn., for appellee.

Before ARNOLD and MAGILL, Circuit Judges, and BATTEY,* District Judge.

BATTEY, District Judge.

Appellants Earl Samuel Stuart and Jerome Olen Hayden were convicted by jury trial in the United States District Court for the District of Minnesota.[1] They were tried jointly for the offense of aiding and abetting each other in knowingly and intentionally attempting to possess with the intent to distribute more than 500 grams of cocaine, a Schedule II controlled substance, a violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(B).

Stuart raises the following claims of error on appeal: (1) the evidence produced at trial was insufficient to establish Stuart's intent to distribute the cocaine; (2) the trial court permitted the government to introduce evidence of specific instances of conduct to improperly rehabilitate the credibility of an important prosecution witness; (3) the trial court should have compelled government production of certain materials under *Brady* and *Jencks;* (4) the defense was improperly restricted from introducing extrinsic evidence for use in impeaching the government's key witness; and, (5) the trial court erred in denying Stuart a two-point reduction at sentencing for acceptance of responsibility.

Appellant Hayden challenges his conviction on the grounds that (1) the government is guilty of outrageous misconduct in offering to front (advance on credit) co-defendant Stuart money to fund the one kilogram cocaine purchase, and (2) Hayden raises a defense which he characterizes as "sentence entrapment." He argues that he was entrapped into committing a more serious offense than one which he was predisposed to commit.

We affirm both convictions.

## I

## FACTS

### (A) Background of Informer

Richard Cohen, a resident of Florida, was arrested in 1988 for distribution of one kilogram of cocaine. Cohen was also under investigation by the Minnesota Bureau of Criminal Apprehension (MBCA) concerning three separate shipments of cocaine into Minnesota. He was indicted in the United States District Court for the District of Minnesota on the cocaine charges, and was separately charged by the State of Florida for the one kilogram transaction in that state. He entered a guilty plea under a plea bargain in the Minnesota case. The United States agreed to move for a downward departure in Cohen's offense level at sentencing provided Cohen substantially assisted the MBCA in investigating Minnesota cocaine traffickers. A plea agreement with Florida authorities allowed Cohen to plead guilty in the one kilogram charge as well. He received a nine-month sentence.

Cohen provided assistance in unrelated cases as well as this case. In the course of his cooperation with the government, Cohen identified Stuart as a Minnesota resident who, over a period of several years, had visited Cohen in Florida and purchased multi-kilo quantities of cocaine from Cohen

---

* The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable Diana E. Murphy, District Judge, United States District Court for the District of Minnesota, Fourth Division.

for distribution in Minnesota. In the two years prior to Cohen's arrest Stuart purchased fourteen kilograms of cocaine from Cohen. Cohen testified that as the business relationship progressed, Cohen fronted cocaine to Stuart with the understanding that Stuart would return to Minnesota to sell the drugs and thus repay Cohen.

### (B) Stuart's Involvement

The instant case arises out of a transaction initiated by Stuart only seven days before Cohen was to voluntarily surrender to authorities to begin service of his nine-month prison sentence.

On October 5, 1989, Stuart paged Cohen on his electronic pager. Cohen returned the call at a previously designated number and was told by Stuart that he was going to Florida and purchase some cocaine.[2] This initial contact from Stuart was followed by several other phone conversations over the next few days, as well as a personal meeting between Cohen and Stuart at a motel in Miami on or about October 8, 1989.

During this meeting Stuart told Cohen that because he was short of money he was interested in purchasing less than the kilogram of cocaine proposed in their earlier phone conversations. Cohen was aware that he could not interest authorities in the case, and thereby receive a government recommendation for a second reduction in his sentence, if the transaction was for less than a kilogram. Accordingly, Cohen offered to front Stuart sufficient cocaine to allow Stuart to purchase an entire kilogram. Stuart agreed to this arrangement.

Cohen and Stuart were not able to complete the transaction during Stuart's visit to Florida. Cohen suggested that Stuart return to Minnesota and Cohen would arrange to have a "friend" deliver the cocaine to Stuart. Cohen notified MBCA Agent Eugene Leatherman on October 10, 1989, that he had arranged this drug sale in Minnesota. Agent Leatherman encouraged Cohen to proceed with the transaction and to record all further telephone calls between Stuart and Cohen.

A series of five recorded phone calls between Stuart in Minnesota and Cohen in Miami took place. The subject of the calls was to organize the logistics of the delivery. At the conclusion of each phone call Cohen contacted Agent Leatherman and replayed each call. Originally Cohen arranged to fly to Minneapolis to deliver the cocaine to Stuart personally, but Agent Leatherman preferred to act as Cohen's "friend" and make the delivery himself. Ultimately, Cohen and Stuart settled on a plan whereby Stuart, accompanied by his bodyguard, was to drive to Rochester, Minnesota, park his car bearing Florida plates in a pre-arranged parking lot and leave the key in the trunk of the lock. Cohen's "friend" was then to approach the car, open the trunk, retrieve the money Stuart had left in the trunk, and deposit the cocaine. Stuart and Hayden were to watch at a distance.

The transaction was originally to take place in the Country Kitchen parking lot at Rochester. Stuart parked his car there. Due to a delay in Leatherman's arrival, Stuart paged Cohen. When Cohen answered the page, the drop spot was changed to McDonald's parking lot. Stuart and Hayden, who had been watching the car from the Country Kitchen, walked to the car and after Hayden opened and closed the trunk, left the parking lot with Stuart driving, accompanied by Hayden as a passenger. Stuart and Hayden drove a few blocks to the McDonald's parking lot.

Stuart and Hayden were inside the restaurant when Leatherman arrived, located the car, opened the trunk and placed a brown bag inside the trunk. As Leatherman was retrieving the money, Stuart came out of the restaurant, walked past Leatherman, looked at him, and went back inside the restaurant. Stuart got into his

---

**2.** The October phone calls were follow-up calls to two telephone conversations between Cohen and Stuart in April 1989, during which a possible one kilogram deal was discussed. Cohen had been arrested in November and was cooperating with authorities in the spring of 1989 while awaiting trial. The April conversations were taped and reveal Stuart and Cohen as longtime associates in drug transactions.

car, drove slowly towards the McDonald's exit and stopped to wait for Hayden. As Hayden was approaching the car, an unmarked police unit pulled in front of Stuart's car, and a uniformed officer stepped out of the car. Stuart shifted into reverse and sped off. A ninety mile-per-hour car chase around Rochester ensued before Stuart was apprehended.

### (C) Hayden's Involvement

Stuart was suspicious of the dealings with Cohen's "man" and stated, "Well, I'm going to sit back and I got this friend of mine that's gonna sit back and—ah, 200 yards, and ah—watch the whole—the whole thing anyway. He's more or less my—been my bodyguard around here." The bodyguard turned out to be Hayden.

Hayden was in McDonald's restaurant with Stuart prior to and at the time of the Leatherman transfer. After the transfer, Hayden left the restaurant and proceeded to meet Stuart as he stopped at the McDonald's exit. The arrival of the unmarked police car and the sudden flight of Stuart left Hayden standing at the scene.

## II

## DISCUSSION

### (A) Stuart's Claims

#### 1. Sufficiency of the Evidence

Stuart first claims error in the denial of his motion for a judgment of acquittal on the distribution count on the grounds that the jury's verdict of guilty with respect to Stuart's intent to distribute was based upon insufficient evidence.

When reviewing the sufficiency of the evidence, an appellate court is required to view the evidence in the light most favorable to the government and to accept as established all reasonable inferences to support the conviction. *United States v. Meeks*, 857 F.2d 1201, 1204 (8th Cir.1988) (quoting *United States v. Rich*, 518 F.2d 980, 984 (8th Cir.1975)). It is not necessary that the evidence at trial be so overwhelming as to exclude every reasonable hypothesis except guilt; rather, the evidence must

merely be sufficient to persuade a jury beyond a reasonable doubt that the defendant has committed the offense alleged. *United States v. Marin–Cifuentes*, 866 F.2d 988, 992 (8th Cir.1989).

■ A criminal defendant's intent to distribute a controlled substance may be proven by circumstantial as well as direct evidence. *Marin–Cifuentes*, 866 F.2d at 992 (citing *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954)).

■ The appellant argues that the evidence of his intent to distribute the cocaine is insufficient because he was not observed selling cocaine, agreeing to sell cocaine, or acting as a courier. It is the rule of this circuit that "neither possession nor an actual sale by a defendant need be proved by the government on a charge of distributing or aiding and abetting the distribution of drugs." *Marin–Cifuentes*, 866 F.2d at 993; *United States v. Nelson*, 563 F.2d 928, 931 (8th Cir.1977).

We have reviewed the record and find ample evidence to support the verdict of the jury. Accordingly, we are unable to find that the district court erred in denying Stuart's motion for a judgment of acquittal.

#### 2. District Court's Evidentiary Rulings

■ Stuart raises two evidentiary ruling issues. He argues that the district court committed error by allowing case agent Leatherman, who sat at counsel table, to testify on rebuttal that Cohen was reliable in this and other investigations. The testimony came after extensive cross-examination conducted to impeach the credibility of Cohen. The trial transcript indicates 125 pages of cross-examination into Cohen's past criminal record, plea agreement, lenient treatment, agreement with Florida authorities, prior drug dealings, drug profits, and other relevant matters.

The testimony was as follows:

Q You had a fair number of dealings with Mr. Cohen over about a year period, isn't that correct?

A Yes.

Q  I mean, after about a year period after the date of his arrest?

A  Yes.

Q  When he was helping in investigations, is that correct?

A  Yes.

Q  In your experience with him, did you find him to be reliable?

MR. SHEEHY: Your Honor, I object to this opinion evidence. It's not a fact.

THE COURT: Overruled.

A  Yes.

Q  And would you explain what you mean?

MR. SHEEHY: Your Honor, I object to this on lack of confrontation grounds.

THE COURT: Overruled.

MR. SHEEHY: And hearsay.

THE COURT: Overruled.

A  Through intelligence reports that I've gathered in the past, through descriptions, places, people's names, I've never found him to be inconsistent in what he was saying to me.

Q  In the investigations that you worked with him on, did you ever have occasion to find that he gave you a deliberate misstatement about the information needed in your investigation?

MR. SHEEHY: Your Honor, I again object on the grounds of it's an improper accreditation of a witness under the rules. And it's opinion as to specific instances of truthfulness or untruthfulness.

MR. SCOTT: I join in the objection, Your Honor.

THE COURT: Overruled.

A  I've never found him to be unreliable in things he stated to me.

The evidence of the guilt of Stuart was overwhelming. The limited nature of the testimony, occurring as it did in rebuttal, leads us to conclude that error, if any, in the admission of the testimony was harmless beyond a reasonable doubt. *United States v. Roy*, 843 F.2d 305, 309 (8th Cir. 1988) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)).

■  Stuart next argues that the district court refused to admit into evidence sales receipts for a Mercedes automobile, mobile phone, and a boat. The purpose of these evidentiary documents was to contradict Cohen's testimony that he "didn't seem to be making any money," despite the fact that his notebook detailed Cohen's transactions with drug purchasers.

We conclude there was no error in the refusal to admit the various sales receipts for the Mercedes automobile, mobile phone, and boat. At best, such evidence was cumulative. Cohen himself admitted the purchase of such items and therefore, any impeaching quality of the receipts added nothing to the cross-examination of Cohen.

### 3. Denial of Motions to Compel Brady and Jencks Material

Prior to trial Appellant Stuart moved the court to compel production of *Brady* and *Jencks* materials, namely: (1) the Minnesota and Florida files in which Cohen worked as an informant; (2) Cohen's Florida criminal file; and (3) internal MBCA recommended policies and procedures in dealing with confidential informants.

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) requires the government to make available to a criminal defendant exculpatory evidence in its possession material to guilt or punishment.

■  With respect to the Minnesota and Florida state files, *Brady* requires that the government's duty to provide information extends only to evidence in the possession of the prosecutor or reasonably available to him. *See United States v. Krauth*, 769 F.2d 473, 476 (8th Cir.1985). The record reflects that in this case the U.S. Attorney's office did make efforts to obtain any *Brady* or *Jencks* materials in these jurisdictions, even though "[a] prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find impeaching evidence every time a criminal defendant" makes a request. *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir.1989). The prosecutor's search for *Brady* and *Jencks* materials in the possession of either the Florida or Minnesota

state authorities yielded only the information provided to the appellant.

■ Nonetheless, Stuart speculates that other materials must have existed, without elaboration as to what materials those might be or their materiality to the case. A "remote possibility" that evidence might exist in other files in other jurisdictions does not require either the government to turn files over to a defendant wholesale, or the trial court to conduct an *in camera* review of government files for evidence favorable to the accused. *United States v. Polowichak*, 783 F.2d 410, 414 (4th Cir. 1986); *United States v. Michaels*, 796 F.2d 1112 (9th Cir.1986).

Finally, with respect to the one-page MBCA internal memorandum on recommended procedures of the agency when dealing with confidential informants, the trial court conducted an *in camera* review of this document and rejected Stuart's discovery request. We find no abuse of discretion in this procedure and similarly reject Stuart's claim of error.

*4. Stuart's Acceptance of Responsibility*

■ In Stuart's final argument he petitions this Court to vacate the trial court's sentence in denying Stuart a two-point reduction in offense level for acceptance of responsibility. United States Sentencing Guidelines Section 3E1.1(a) permits a two-level sentencing reduction to a criminal defendant who "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct."

Stuart argues that statements made by him acknowledging his guilt in the pre-sentence report and during allocution at sentencing entitle him to the downward adjustment for acceptance of responsibility. Note 2 in the commentary to the guidelines affirmatively states, however, that "this adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying essential *factual* elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, note 2 (emphasis added). In interpreting the guide-

lines we have stated that "[a] defendant's calculated simulations of remorse, however, do not automatically entitle him to a discount in his sentence for acceptance of responsibility." *United States v. Wivell*, 893 F.2d 156, 158–59 (8th Cir.1990).

We recognize that the sentencing judge is in a unique position to evaluate the defendant's acceptance of responsibility. For this reason the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless the judge's decision is without foundation. We find no error in the district court's exercise of discretion to deny the two-point reduction for acceptance of responsibility.

### (B) Hayden's Claims

*1. Sentencing Entrapment—Outrageous Conduct*

Appellant Hayden raises two interrelated issues on appeal. He argues that the conduct of the government in fronting the necessary money to purchase a larger quantity of drugs than that which Stuart had the means with which to pay, entrapped Hayden into committing an offense greater than that which he was predisposed to commit.

■ In order to demonstrate entrapment as a matter of law,

the evidence must clearly show that a *government agent* originated the criminal design; that the *agent* implanted in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the *urging of the government.*

*United States v. Shaw*, 570 F.2d 770, 772 (8th Cir.1978) (emphasis added). The defense of entrapment focuses on the intent or predisposition of the defendant to commit the crime rather than upon the conduct of the governments' agents. *Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976).

■ Hayden further presents the rather novel argument that he was subjected to conduct which he describes as "sen-

tencing entrapment." "Sentencing entrapment" as defined by the defendant, posits the situation where a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment. Hayden argues that this is especially true in view of the mandatory minimum sentences for drug offenses. Essentially Hayden invites this court to abandon its long-established rule of entrapment which focuses on the predisposition of the defendant to commit crime. Perhaps there is such a thing as "sentencing entrapment," see United States v. Lenfesty, 923 F.2d 1293, 1300 (8th Cir.1991), but we are not persuaded that Hayden has succeeded in establishing it. The record does not show with sufficient clarity that Hayden was predisposed to commit only a lesser offense.

We find no entrapment as a matter of law. United States v. Williams, 873 F.2d 1102 (8th Cir.1989).

For the foregoing reasons, the judgment of the district court is affirmed.