**UNITED STATES of America, Appellee,**

v.

**Nathan STEIN, Appellant.**

**No. 91–3368.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 14, 1992.

Decided Aug. 10, 1992.

Thomas Cotter, St. Louis, Mo., argued (Norman London, on the brief), for appellant.

Rosemary Casey Meyers, Asst. U.S. Atty., St. Louis, Mo., argued, for appellee.

Before JOHN R. GIBSON, Circuit Judge, PECK,* Senior Circuit Judge, and BEAM, Circuit Judge.

BEAM, Circuit Judge.

Nathan C. Stein was convicted of two counts of bribing a public official, in violation of 18 U.S.C. § 201(b)(1). He appeals from the judgment of the district court, claiming that the district court erred in calculating his offense level because he was the victim of "sentencing entrapment." We affirm.

## I.  BACKGROUND

Stein was a certified public accountant, with an office in St. Louis, Missouri. Trial Transcript at 451. His practice included tax return preparation and representing clients before the IRS. *Id.* at 4–5. One of

---

* The HONORABLE JOHN W. PECK, Senior Circuit Judge, United States Court of Appeals for

the Sixth Circuit, sitting by designation.

Stein's clients was the Field Floor Company, a carpet and floor covering business. *Id.* at 2–3. Field Floor hired Stein in 1987 to help it resolve its delinquent tax problem. Some time later, Stein purchased some carpet from his client, at a cost of nearly $10,000, for installation in a house he was then renovating. *Id.* at 15. In late August 1987, the IRS was about to close Field Floor's business because of its continued delinquency. Stein realized that this might prevent the delivery and installation of his carpet. Stein telephoned Frank Lipski, the IRS officer assigned to collect Field Floor's taxes, and explained his problem and the construction delays on his home. Stein asked Lipski to delay the closing of Field Floor until after his carpet was installed. In consideration for the delay, Stein offered Lipski the use of his home at Lake of the Ozarks for a weekend. *Id.* at 148–51. Lipski declined the offer and reported the conversation to his supervisor. *Id.* at 152. (IRS inspectors thereafter recorded all telephone calls between Stein and Lipski. *Id.* at 154.) A couple of weeks later, Stein offered the use of his lake home to Lipski again. This time, at the direction of IRS agents, Lipski accepted the offer. *Id.* at 587. Once Stein's carpet was installed, Stein informed Lipski that he could close the Field Floor business and suggested to Lipski that they continue to work together. *Id.* at 222.

Approximately one month before Stein offered the use of his lake home to Lipski, IRS agents had already planned an undercover operation to investigate Stein. Agents had heard allegations that Stein was making "illegal offers and compromise[s]." *Id.* at 536, 587–88. To investigate these allegations, they established a fictitious tax account in the name of Joseph Gallo, with an IRS agent playing the role of Gallo. *Id.* at 427–31. This undercover operation was postponed when Stein offered his bribe to Lipski, but it was continued again in November 1987, with the collection of Gallo's delinquent taxes assigned to Lipski. *Id.* at 593–94.

Lipski began his collection of Gallo's "delinquency" by filing fictitious federal tax liens against Gallo in the amount of $116,- 156.22. *Id.* at 226. In January 1988, after the liens were filed, Stein sent a letter to Gallo offering to represent him. *Id.* at 431–32. (Stein's accounting firm had a practice of sending such letters to taxpayers against whom liens in amounts of at least $10,000 were filed. *Id.* at 43.) Stein then met with Gallo and suggested that he conceal his assets, in preparation for making an offer to the IRS in an amount lower than was owed. Later, Stein met with Lipski and suggested to him that he "bury" Gallo's delinquent account, meaning "to put it in uncollectible status." *Id.* at 242. Lipski agreed to do so and Stein later gave Lipski $700 of $1,000 he had received from Gallo as a down payment on the bribe. Stein then reached an agreement with Lipski that the bribe amount would be $30,000 (Lipski had suggested a much lower amount), with $20,000 for Lipski and $10,- 000 for Stein. Gallo eventually agreed to pay $20,000, but before any money changed hands, Stein was arrested. *Id.* at 255–63.

Following a jury trial, Stein was convicted, as noted above, of two counts of bribing a public official. The first count of conviction was for the bribe to Lipski in consideration for delaying the closing of the Field Floor Company. The second count of conviction was for Stein's bribe to Lipski on behalf of Gallo. At sentencing, the district court calculated Stein's offense level, as required by the guidelines, according to the amount of Stein's bribes. Under the guidelines, the severity of an offense level increases incrementally, according to the amount of a bribe. Pursuant to U.S.S.G. § 2C1.1 and Application Note 2 of that section, the "amount of a bribe" is to be determined by looking to the "greater of the value of the bribe or the value of the benefit received, or to be received, in return for the bribe." U.S.S.G. § 2C1.1, comment. (n. 2). In Stein's case, the value of the benefit received in his second count of conviction was the greater value—that is, the elimination of Gallo's tax liability of $116,156.22.

## II. DISCUSSION

Stein claims that the district court erred in calculating the offense level for his sec-

ond count of conviction. He argues that the government's actions amounted to "sentencing entrapment" because the value of the bribe, which was determined by the IRS when it set up the fictitious account for Gallo, ultimately determined the severity of his sentence. Stein argues that because the IRS knew his office would send a letter to anyone against whom a tax lien of at least $10,000 was filed, the government, by filing fictitious tax liens in the amount of about $116,000, laid a bigger trap, so to speak, than was necessary. It is Stein's position, apparently, that the government's actions were a violation of the due process clause of the Fifth Amendment. We disagree.[1]

To date, we have not recognized "sentencing entrapment" in this circuit. In *United States v. Lenfesty*, 923 F.2d 1293 (8th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991), we noted that the argument, at least with respect to an amount of illicit drugs, might "bear fruit" if "outrageous official conduct overcomes the will of an individual predisposed only to dealing in small quantities." *Id.* at 1300. In *Lenfesty*, the record showed that the defendant was predisposed in the opposite respect—that is, he was willing to supply drugs in any quantity desired. *Id. See also United States v. Connell*, 960 F.2d 191, 196 (1st Cir.1992) (noting that the guidelines may permit "sentencing factor manipulation," but declining "to chart the line between permissible and impermissible conduct"; sentencing court, moreover, has power to exclude "the tainted transaction" or depart); *United States v. Stuart*, 923 F.2d 607, 613–14 (8th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 1599, 113 L.Ed.2d 662 (1991) (record does not show that the defendant committed a drug offense "greater than that which he was predisposed to commit"); *cf. United States v. Barth*, 788 F.Supp. 1055, 1057–58 (D.Minn.1992) (departing from guideline-

specified sentence on the basis that the government agent made continuous drug buys until the amount of drugs sold by the defendant required a mandatory minimum sentence). The principle suggested in *Lenfesty* can also be applied to Stein's case, and with a similar result.

If Stein were to succeed in his argument, he would have to demonstrate that the IRS agents acted outrageously in overcoming a predisposition on his part to only offer bribes for clients whose tax liabilities were smaller than Gallo's. There is nothing in the record of Stein's case to support this. In fact, there was some evidence that Stein was predisposed to deal in schemes with a high value. Stein, for example, had a practice of sending letters to potential clients against whom tax liens in an amount of *at least* $10,000 were filed. Stein tries to distinguish *Lenfesty* on the basis that the repeated drug sales in that case were necessary to an ongoing investigation and that there was no evidence in *Lenfesty* that the government was attempting to achieve a lengthier prison sentence for the defendant by selling him a larger quantity of drugs. This is not a convincing distinction. It is of no consequence whether the criminal acts were part of an ongoing investigation, and Stein has presented no evidence in his own case that the IRS agents were attempting to achieve a particular sentence for him when they established Gallo's fictitious tax status. Gallo's tax liens were filed on November 12, 1987, but the undercover operation investigating Stein was planned and started in the summer of 1987—well before the sentencing guidelines became effective on November 1, 1987.

### III. CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

---

**1.** Stein also argues that the district court erred in permitting certain IRS agents and other government employees to testify after these witnesses had refused to be interviewed by him beforehand without a government attorney present. The issue raised by Stein does not require more than this mention, for the district court did not abuse its discretion in allowing the witnesses to testify and Stein has not demonstrated that he was prejudiced by the district court's decision.