988 F.2d 798
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert August NELSON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jeffrey Jon HEINEN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Daniel HEINEN and Data Hardware, Inc., Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
David D. HEINEN, Defendant-Appellant.
 Nos. 92-1793, 92-1794, 92-1945 and 92-2735.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 14, 1992.
Decided March 2, 1993.
Rehearing and Rehearing En Banc Denied April 12, 1993.
 
 Philip Resnick and Ronald Meshbesher, Minneapolis, MN, for defendants-appellants.
 Douglas Peterson, Asst. U.S. Atty., Minneapolis, MN, argued, for plaintiff-appellee.
 Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 These appeals are from convictions arising from the switching of labels on valuable IBM computer parts called thermoconductor modules or TCMs. Robert August Nelson, Jeffrey Jon Heinen, David Daniel Heinen, and Data Hardware, Inc. appeal from convictions for conspiracy to defraud in violation of 18 U.S.C. § 371 (1988), aiding and abetting mail fraud in violation of 18 U.S.C.A. § 1341 (West Supp.1992) and 18 U.S.C. § 2 (1988), and aiding and abetting the interstate transportation of property taken by fraud in violation of 18 U.S.C. § 2314 (1988) and 18 U.S.C. § 2. For reversal, they argue that there was insufficient evidence to support their convictions, and that the district court made several evidentiary errors, erred in denying severance, and should have granted a mistrial based on remarks the government made in its closing argument. They also claim that their sentencing was unlawful because the district court failed to: correctly calculate the alleged losses involved; recognize a payment made before indictment; acknowledge acceptance of responsibility; and consider the relative roles in the offense or consider the propriety of a combined sentence. David Heinen also appeals from the district court's modification of sentence, changing a $250,000 fine payable as a condition of supervised release to payable immediately. We affirm the convictions and sentences, but conclude that the district court erred in modifying the payment terms of Heinen's fine.
 
 
 2
 A TCM is a six-inch black box that is the heart or brain of IBM's large mainframe computers. Although TCMs look alike from the outside, their capabilities (and accordingly, their price) vary depending on their microchip circuitry. Each TCM bears an aluminized label stamped with a ten-digit alphanumeric serial number, a seven-digit part number, and a four letter code. The serial numbers are unique and allow IBM to track individual TCMs.
 
 
 3
 IBM sells new TCMs for $50,000 to $140,000. In an effort to stand behind its products, IBM allows its customers to exchange failing TCMs for replacement TCMs on a "like-for-like" basis, that is, the same part number for the same part number. Under this program, a customer could return a failing TCM and receive a new one for $17,000. This program was a way for IBM customers to obtain replacement TCMs, not a way to obtain new TCMs. When a customer brought in a failing TCM for replacement, IBM required the customer to sign an exchange contract identifying the TCM by serial number and certifying that the purpose of the exchange was "to meet an immediate maintenance need."
 
 
 4
 The transactions giving rise to this case are essentially undisputed. Data Hardware's business consisted of storing, servicing, and refurbishing computers and computer-related equipment, primarily IBM's large mainframe computer systems. From July 15, 1988, through December 14, 1988, Data Hardware took advantage of IBM's exchange program by taking labels from its newer, more expensive TCMs, placing the labels on its older, lower-value TCMs, and exchanging the "switched label" TCMs for new TCMs. Under this procedure, Data Hardware received new TCMs for $17,000, instead of paying the usual $50,000 to $140,000 sales price. Data Hardware made seventeen "switched label" exchanges and obtained $2,035,000 worth of TCMs.
 
 
 5
 Data Hardware, David Heinen, its president and sole shareholder, Robert Nelson, its vice president, and Jeffrey Heinen, a computer technician who worked for Data Hardware, were convicted on seventeen counts of aiding and abetting mail fraud, ten counts of aiding and abetting the interstate transportation of goods taken by fraud, and one count of conspiracy to defraud. This appeal followed.
 
 I.
 
 6
 Data Hardware[1] first argues that there was insufficient evidence to sustain the convictions because the government failed to prove: (1) criminal intent; (2) that the exchanges deprived IBM of anything of value; (3) that Data Hardware intended to use the mails as part of the alleged fraud; and (4) that the property was obtained by the alleged fraud.
 
 
 7
 In determining whether the evidence is sufficient to support the convictions, we evaluate the evidence in its entirety and in the light most favorable to the verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In reviewing guilty verdicts, we give the government the benefit of all reasonable inferences from the evidence. United States v. Long, 952 F.2d 1520, 1524-25 (8th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992).
 
 
 8
 Data Hardware argues that the government failed to prove criminal intent. Data Hardware admits that it switched labels from old TCMs to obtain new TCMs for $17,000, but says that it made the exchanges to quickly obtain urgently needed parts. Data Hardware points out that IBM was the only manufacturer of TCMS, and that it experienced long delays in obtaining TCMs from IBM's marketing department. Data Hardware relies on the IBM exchange agreement which provided that the $17,000 exchange price was provisional pending inspection of the TCM and final billing, and says that it always intended to pay the full price for what it received.
 
 
 9
 There was ample evidence from which the jury could find criminal intent. Two former employees testified about conversations in which they heard Nelson talk about doing some "magic at IBM." One former employee overheard Nelson talk about "pulling the wool over IBM's eyes." There was also testimony that Jeffrey Heinen talked about doing "some magic at IBM." Data Hardware's "justification defense" is also refuted by evidence that there were other sources of TCMs. Testimony established that used TCMs were available on the open market, and TCMs could be taken from systems bought or leased. In addition, there was evidence that when Data Hardware made its last exchange on December 15, Data Hardware had four of the same type TCMs in its inventory, as well as 30 high-value TCMs. Evidence that Data Hardware sold one of the "switched label" TCMs to another company for that company's upgrade work contradicts Data Hardware's claim that it obtained TCMs to avoid penalty clauses in its dealings with upgrade customers.
 
 
 10
 The jury could have inferred criminal intent from the timing of the transactions. Data Hardware made its first exchange on July 15, 1988. Data Hardware then made a legitimate exchange on July 25. On August 17, IBM sent out the $17,000 invoice for the July 15 exchange, and following receipt of that invoice, Data Hardware made sixteen more "switched label" exchanges.
 
 
 11
 There was evidence from which the jury could infer that Data Hardware did not intend to pay the full sales price for the TCMs. Until Data Hardware was caught, Data Hardware made no effort to repay the difference between the full sales price and the $17,000 exchange contract price. There was testimony that IBM lab personnel and field engineers trusted labels, and an IBM engineer testified that Data Hardware's scheme would have worked except for a Data Hardware employee informing the FBI and IBM of the plan.
 
 
 12
 Testimony showed Data Hardware's attempts to conceal its plan. There was also testimony that Nelson told a Data Hardware employee repayment would be made only if IBM "find[s] out." Data Hardware also obtained TCMs from IBM for the exchange contract price by using a label from a high-value TCM carrying case. To keep IBM from learning that there were two TCMs with the same serial number, Data Hardware made sure that these TCMs went to customers outside the United States or to companies Data Hardware knew would not turn to IBM for maintenance work. In addition, Data Hardware made sure that one customer would not receive two TCMs with the same serial number. These efforts at concealment are powerful evidence of conscious wrongdoing. See United States v. Dial, 757 F.2d 163, 170 (7th Cir.1985), cert. denied, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985).
 
 
 13
 Data Hardware contends that the government failed to prove that IBM was harmed or deprived of anything of value. Data Hardware says that IBM's "like-for-like" exchange policy is a red herring. It points out that the actual value of the returned TCMs was irrelevant because the exchange program required only that the returned TCM be the same type, not that it have any actual value. Data Hardware argues that IBM's true goal was to control the number of TCMs in the market, evidenced by the fact that no true monetary value was at stake in the exchanges.
 
 
 14
 These arguments ignore the IBM exchange contract which required Data Hardware to identify each TCM returned to IBM by serial number and to certify that "the purpose of this purchase is to meet an immediate maintenance need." Data Hardware does not dispute that it supplied false serial numbers on the exchange contracts. Further, Data Hardware obtained seventeen TCMs for $17,000 each, when their actual sales price ranged from $50,000 to $140,000. IBM was deprived of value. We also recognize that the government need not prove actual injury. "The crime of mail fraud is broad in scope ... condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." Atlas Pile Driving Co. v. DiCon Financial Co., 886 F.2d 986, 991 (8th Cir.1989); see also Dial, 757 F.2d at 170 (fraud found despite fact that losses did not materialize).
 
 
 15
 Data Hardware next argues that it cannot be guilty of mail fraud because the government failed to prove its use or intended use of the mails in furtherance of any fraudulent scheme as required by 18 U.S.C.A. § 1341.[2] Data Hardware argues that the only use of the mails here was IBM's mailing of the $17,000 invoices, and that these mailings were not sufficiently linked to the fraud to be covered under the mail fraud statute.
 
 
 16
 The mail fraud statute does not reach all frauds, only those " 'in which the use of the mails is a part of the execution of the fraud.' " Schmuck v. United States, 489 U.S. 705, 710, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989) (citations omitted). "[T]he use of the mails need not be an essential element of the scheme"--it need only be " 'incident to an essential part of the scheme' or 'a step in (the) plot.' " Id. at 710-11, 109 S.Ct. at 1447 (citations omitted). A mailing may be routine or even sent for a legitimate business purpose so long as it assists in carrying out the fraud. Atlas Pile Driving Co., 886 F.2d at 992. It is not necessary that the defendants actually mail something, only that "they caused it to be done." Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); see also United States v. Alanis, 945 F.2d 1032, 1037 (8th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 906, 116 L.Ed.2d 807 (1992).
 
 
 17
 The Supreme Court has considered the mailing requirement on several occasions. In Schmuck, a used car distributor sold cars with rolled back odometers to car dealers. 489 U.S. at 707, 109 S.Ct. at 1445. After the car dealers sold the cars, they applied for title, and the government invoked the mail fraud statute on the basis of the title application. Id. The Court held that a rational jury could have found that the title registration mailings were part of the fraudulent scheme. Id. at 712, 109 S.Ct. at 1448. The Court reasoned that although the mailings may not have directly contributed to the duping of the car dealers or customers, the success of the scheme depended on the successful passage of title. Id.
 
 
 18
 The Supreme Court concluded that the government failed to prove the mailing requirement in three other cases. In United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), the Court affirmed the Sixth Circuit's reversal of a mail fraud conviction because the mailings were not "sufficiently closely related" to the fraudulent scheme. Id. at 399, 402, 94 S.Ct. at 648, 649. The defendant in Maze used a stolen bank credit card, and the mailings were merchant and bank invoices. Id. at 396-97, 94 S.Ct. at 646-47. The Supreme Court held that the mailings could not support a mail fraud conviction because the invoices were not " 'for the purpose of executing the scheme,' " id. at 400, 94 S.Ct. at 649 (quoting Kann v. United States, 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944)), as the defendant's scheme reached fruition when he received each good or service using the stolen credit card. Id. 414 U.S. at 402, 94 S.Ct. at 649. In Kann v. United States, the Court held that the mailing of cashed checks to drawee banks could not supply the mailing element as the "persons intended to receive the money had received it irrevocably," and thus, the scheme had "reached fruition" before the mailing occurred. 323 U.S. at 94, 65 S.Ct. at 151. In Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), the government based some of the charges on the unauthorized use of a credit card, and the mailings were the merchant invoices and the cardholder's mailing of checks for payment. Id. at 392, 80 S.Ct. at 1184. Relying on Kann, the Court found the mailing element not satisfied, as the scheme reached fruition when the defendants received the goods and services using the credit card, and therefore, the mailings were not for the purpose of executing the scheme. Id. at 393, 80 S.Ct. at 1184.
 
 
 19
 The facts before us are analogous to those in Schmuck. A rational jury could have concluded that IBM's mailing of the invoices was incident to an essential part or part of the fraudulent scheme. See Schmuck, 489 U.S. at 710-11, 109 S.Ct. at 1447; United States v. Ribaste, 905 F.2d 1140, 1142 (8th Cir.1990) (letter tentatively accepting defendant as a dealer was a necessary step in completion of fraud). Although Data Hardware obtained the TCM before IBM sent the invoice, a jury could find that the scheme was not complete until Data Hardware received the IBM invoice billing Data Hardware the $17,000 exchange contract price instead of the $50,000 to $140,000 sales price. The IBM invoice was more than an accounting copy. It is most telling that Data Hardware did not go forward with its second exchange until it received the invoice for the first exchange showing the success of its scheme.
 
 
 20
 Finally, Data Hardware claims that to prove conspiracy to commit mail fraud and intentionally transport goods taken by fraud, the government must prove that Data Hardware intended or foresaw mailings as part of its scheme to defraud. For support, Data Hardware cites United States v. Donahue, 539 F.2d 1131 (8th Cir.1976). In that case, we explained that to prove conspiracy to violate the mail fraud statute, the government must show that the scheme contemplated the use of the mails. Id. at 1135.
 
 
 21
 We reject Data Hardware's argument. Although we question the viability of the requirement in Donahue[3] that conspirators "contemplate the use of the mails," we conclude that the evidence was sufficient to show that the appellants contemplated the use of the mails as part of their scheme to defraud.[4] As we have said above, the invoice evidences completion of the process of obtaining an expensive TCM for only the $17,000 exchange price. Further, there was evidence that appellants made a "switched label" exchange on July 15, 1988, and waited until they received the invoice mailing from IBM to continue with their plan. From this, a jury could reasonably infer that the appellants actually contemplated the use of the mails as part of their scheme to defraud. Appellants' argument that they were waiting for IBM's "final bill" (received in March 1989 as part of the settlement of the civil lawsuit) is spurious. The IBM invoices they received for the "switched label" invoices were the same as for all other TCM orders.
 
 II.
 
 22
 Data Hardware next complains about three evidentiary rulings, the district court's failure to sever the trial, and the court's failure to grant a mistrial based on the government's closing argument.
 
 A.
 
 23
 Data Hardware and David Heinen argue that the district court erred in admitting Data Hardware's 1988 corporate tax return and Heinen's 1988 W-2 form. They contend that the government offered this evidence only to paint Data Hardware and Heinen as "fat cats," and that the evidence was irrelevant and prejudicial.
 
 
 24
 Appellate courts leave the balance between relevance and prejudice under Fed.R.Evid. 403 to the district court. United States v. Lucas, 932 F.2d 1210, 1217 (8th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991). We reverse only if there is an abuse of discretion. Id.
 
 
 25
 We cannot conclude that the district court abused its discretion in admitting this evidence. The information was relevant to refuting Data Hardware's defense that label switching was the only way to obtain urgently needed TCMs. The corporate tax return demonstrated that Data Hardware had assets of $9,755,213, which consisted primarily of computers. The corporate tax return also confirmed that Data Hardware had a subsidiary, Sovran, which was in the computer leasing business. This evidence showed that Data Hardware had computers from which it could obtain "urgently needed" TCMs. The corporate tax return and Heinen's W-2 form (reflecting wages of $478,849) showed that Data Hardware and Heinen had the resources to stock TCMs. Further, the evidence was not prejudicial. The district court excluded Data Hardware's consolidated financial statements and Heinen's 1988 personal tax return.
 
 
 26
 Second, Data Hardware complains that the district court erroneously allowed testimony that David Heinen had falsely reported a burglary as an "insurance scam." This testimony came in without objection, and, in fact, defense counsel overrode his co-counsel's efforts to object. A defendant cannot "open the door" and "invite error" through his cross-examination of a prosecuting witness and then seek appellate review. See, e.g., United States v. York, 830 F.2d 885, 892-93 (8th Cir.1987), cert. denied, 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988). There was no plain error.
 
 
 27
 Third, Data Hardware urges that the district court abused its discretion by excluding Daniel Berlin's testimony about Data Hardware's justification for label switching. Data Hardware argues this testimony was critical to establishing its good faith defense, particularly because the government was allowed to ask several witnesses whether Data Hardware lacked justification for its actions. The record, however, shows that although the district court initially excluded Berlin's testimony on this point, the judge later changed his mind and allowed it to come before the jury. Thus, Data Hardware's argument lacks merit.
 
 B.
 
 28
 Jeffrey Heinen argues that the district court erred by denying his request for severance. Such a ruling is not a ground for reversal unless clear prejudice and an abuse of discretion are shown. United States v. Pecina, 956 F.2d 186, 188 (8th Cir.1992). "We have held on numerous occasions that 'persons charged with a conspiracy will generally be tried together, especially where proof of the charges against each of the defendants is based on the same evidence and acts.' " Id. (quoting United States v. O'Meara, 895 F.2d 1216, 1218 (8th Cir.), cert. denied, 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990)).
 
 
 29
 Jeffrey Heinen bases his argument on the fact that he was merely a technician, and that there was little proof against him. He says that the prejudicial impact is established by the jury's (apparent) initial unanimous determination of not guilty on all counts.[5] He says that the complexity of the case prevented the jury from compartmentalizing the evidence, and thus severance should have been ordered. The complexity in this case, however, arose from the underlying facts concerning IBM's mainframe computers. The case was not more complex because the trial included three individual defendants and one corporate defendant. "Disparity in the weight of the evidence as between the [co-conspirators] does not entitle one to severance." Id.
 
 
 30
 Jeffrey Heinen and Robert Nelson also assert that the district court should have severed their trials when a witness testified about a conversation with David Heinen in which David Heinen blamed the label switching on Nelson. Jeffrey Heinen and Robert Nelson argue that these co-conspirator statements denied them their Sixth Amendment right to confront and cross-examine their accusers under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The Sixth Amendment issues raised in Bruton, however, concern post-conspiracy statements, id. at 132-37, 88 S.Ct. at 1625-28, which are not in issue here. The district court did not abuse its discretion by refusing to sever these appellants' trials.
 
 C.
 
 31
 Appellants contend that certain remarks made by the prosecutor during closing argument deprived them of a fair trial, and warrant reversal. They complain that the government improperly criticized defense counsel and vouched for the credibility of government witnesses.
 
 
 32
 Prosecutors should refrain from personal attacks on defense counsel. United States v. O'Connell, 841 F.2d 1408, 1428 (8th Cir.), cert. denied, 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1988). Nevertheless, "[i]nappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, ... the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." United States v. Young, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). "The trial court has broad discretion in controlling closing arguments and without a clear showing of abuse, that discretion will not be overturned." United States v. Wesley, 798 F.2d 1155, 1156 (8th Cir.1986) (quoting United States v. Lewis, 547 F.2d 1030, 1036 (8th Cir.1976), cert. denied, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977)).
 
 
 33
 The "personal attack" appellants complain of concerns the prosecutor's statement that "these defense lawyers have pulled out a lot of tricks to question the credibility of--." The prosecutor did not complete the sentence because of a defense objection. The court immediately reminded the jury that their decision should be based on the evidence and not on "terms and words" used in argument. The prosecutor apologized on the record and reminded the jury "to listen to those witnesses and assess the truth for yourself." There was no prejudicial error in his statements.
 
 
 34
 Appellants' second allegation of prosecutorial misconduct centers on allegations that the prosecutor vouched for the credibility of government witnesses. Appellants cite the prosecutor's statement that a government witness "didn't come up here making things up." The record, however, shows that the prosecutor actually said that the government witness "didn't come up here making things up about all these defendants." (Emphasis added). This argument asked the jury, when judging the witness's credibility, to consider that the witness did not implicate all four defendants. Such an argument is not improper. Similarly, we have reviewed the other statements pointed to by appellants and conclude they do not constitute improper statements or amount to prejudicial error.
 
 III.
 
 35
 Appellants attack their sentencing on several grounds. They contend that the sentences were unlawful because the district court failed to: (1) correctly calculate the values involved; (2) recognize a $1.7 million payment Data Hardware made two years before the indictment; (3) acknowledge acceptance of responsibility; (4) properly consider the relative roles in the offense; and (5) consider the propriety of a combined sentence.
 
 
 36
 The district court subtracted the $17,000 exchange price from the sales price for each of the switched label TCMs, and found that the loss associated with the fraudulent conduct was $1,746,000. The court thus enhanced the appellants' base offense level by nine levels pursuant to United States Sentencing Commission, Guidelines Manual, § 2F1.1(b)(1)(M) (Nov.1991). Data Hardware urges that the court failed to correctly calculate the values involved because the "intended loss" bears no relationship to economic reality. Data Hardware says that IBM did not lose money and, in fact, may have gained money. For proof of this point, Data Hardware notes that IBM did not require that the returned TCM have any actual value, and that IBM never returned the exchanged TCMs, which had values of at least $5,000 to $10,000 each to Data Hardware.
 
 
 37
 Data Hardware contends that the district court's failure to place a value on the returned TCMs and credit this to Data Hardware's loss amount conflicts with U.S.S.G. § 2F1.1, comment. (n. 7(a)), which provides:
 
 
 38
 A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (i.e., $30,000). In a case involving a misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received.
 
 
 39
 Data Hardware goes on to argue that the district court's failure to recognize the economic realities of IBM's alleged losses conflicts with other circuit court decisions. Data Hardware points out that the Third Circuit in United States v. Kopp, 951 F.2d 521 (3rd Cir.1991), distinguished fraud and theft losses and observed that under the fraud guideline, "loss" is defined "primarily as the amount of money the victim has actually ended up losing at the time of sentencing, not what it could have lost.[6] " Id. at 531, 536. Data Hardware also cites United States v. Smith, 951 F.2d 1164 (10th Cir.1991), and United States v. Schneider, 930 F.2d 555 (7th Cir.1991). In Smith, the Tenth Circuit distinguished "naked fraudulent takings and exchanges of property where the wrongdoer merely misrepresents the value of the consideration advanced." 951 F.2d at 1167. The court concluded that "if the fraud consists of an unequal exchange of property," net value is used to measure loss. Id. The Seventh Circuit reached the same conclusion in Schneider, 930 F.2d at 557-59. This circuit recently questioned the reasoning of these three cases, United States v. Prendergast, 979 F.2d 1289 (8th Cir.1992), and reaffirmed our decision in United States v. Edgar, 971 F.2d 89, 93-95 (8th Cir.1992), which held that "the amount of loss used to increase the offense level under the fraud guideline 'may be either the amount of loss the defendant intended to inflict or the actual loss resulting from the fraudulent conduct, whichever is greater.' " Prendergast, 979 F.2d at 1292 (citations omitted). In Prendergast, we specifically rejected the suggested definition of "loss" under the fraud guideline as "net loss," or actual harm caused to the victims. Id. at 1292 & n. 1.
 
 
 40
 The district court's factual findings as to the amount of loss are reversible only for clear error. United States v. Morton, 957 F.2d 577, 580 (8th Cir.1992). We cannot conclude that the district court clearly erred in calculating the loss. Indeed, the loss calculation was consistent with our decisions in Edgar and Prendergast. In addition, Data Hardware's argument that the loss calculation does not reflect "economic reality" ignores the realities of IBM's marketing and business philosophies. Simply put, IBM did not buy or want used TCMs. IBM took used TCMs pursuant to its exchange program. This is vastly different from a false loan application situation in which a bank ordinarily could, and would, sell the underlying collateral. See United States v. Johnson, 908 F.2d 396, 398 (8th Cir.1990) (holding that the district court did not err in refusing to reduce loss amount by amount recouped by sale of collateral). Likewise, the district court's failure to reduce the loss by the $1.7 million restitution payment is not a ground for finding a sentencing error. A subsequent recovery of funds does not diminish the dollar amount applicable in sentencing. Sentencing may be based on "the possible loss the defendant attempted to inflict." Prendergast, 979 F.2d at 1292.
 
 
 41
 Appellants also assert that sentencing entrapment compels a downward departure in their sentences. They point out that IBM and the government knew about the first mis-labeled TCM in July 1988, and the loss would have been far less if the government had brought it to a halt in the early stages.
 
 
 42
 In United States v. Lenfesty, 923 F.2d 1293 (8th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991), this court acknowledged that sentencing entrapment may be a valid consideration when "outrageous official conduct overcomes the will of an individual predisposed only to dealing in small quantities." Id. at 1300. In United States v. Stuart, 923 F.2d 607 (8th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 1599, 113 L.Ed.2d 662 (1991), we considered an argument analogous to appellants'. In Stuart, the defendant argued that the government's front of money to purchase a larger quantity of drugs than that which he had the means to pay, entrapped him into committing an offense greater than that which he was predisposed to commit. Id. at 613-14. The defendant argued that although he was predisposed to commit a minor offense, he was entrapped into committing a greater offense subject to greater punishment under the sentencing guidelines. Id. at 614. We explained that accepting this argument would require us to "abandon [our] long-established rule of entrapment which focuses on the predisposition of the defendant to commit crime." Id.
 
 
 43
 We are concerned with the government conduct in this case. It seems that there was no legitimate reason for this scheme to continue as long as it did. Obviously, the longer the scheme continued, the higher the losses, and the longer the sentences. Nevertheless, appellants make no argument which compels a conclusion that they were not predisposed to commit these offenses. Indeed, the facts refute such an argument.[7] Accordingly, we cannot conclude the district court erred in calculating the losses or sentencing.
 
 
 44
 Data Hardware's final two sentencing arguments merit little discussion. All appellants argue that they are entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. The sentencing transcripts show that the district court did not clearly err in refusing a downward departure based on acceptance of responsibility. The district court decided not to make a downward adjustment for David Heinen observing that Heinen "continue[s] to maintain innocence." The court also rejected Nelson's request for a downward departure, observing that Nelson "failed to meet with the probation officer," and "denied criminal conduct, insisting that he engaged only in a 'deceptive practice and a sharp business practice.' " The court rejected Jeffrey Heinen's request for similar reasons, noting that Jeffrey Heinen continues to allege that he had an "insignificant" role in the scheme, despite his conviction. The appellants' admission that they switched the labels and made restitution to IBM does not necessarily translate into a finding of acceptance of responsibility.
 
 
 45
 Likewise, we reject Jeffrey Heinen and Robert Nelson's argument that the district court should have decreased their offense levels for minimal and minor roles. Determinations of role are fact questions reviewed under the clearly erroneous standard. United States v. Streeter, 907 F.2d 781, 787 (8th Cir.1990). Jeffrey Heinen received a two-level reduction for his minor role. He contends that his offense level should have been decreased another two levels for a minimal role. Although the evidence showed that Jeffrey Heinen's role was different than the others, he nevertheless played an integral part in the charged scheme. The district court did not err in denying Heinen a "mitigating role" reduction merely because others in the scheme were more culpable. See, e.g., United States v. West, 942 F.2d 528, 531 (8th Cir.1991). Here, Jeffrey Heinen admitted that he switched labels on several occasions. Similarly, the court's failure to depart based on Nelson's role is fully supported by the record. Nelson, a vice-president, had a significant role in the scheme.
 
 
 46
 David Heinen attacks his $250,000 fine, arguing that the court failed to consider a combined sentence as required by U.S.S.G. § 5E1.2(d)(1)-(4), and 18 U.S.C. § 3572. He argues that the fine is excessive, particularly in light of a $2.7 million guaranty executed by himself and his wife for the benefit of Data Hardware and the restitution payment made to IBM.
 
 
 47
 We reject Heinen's argument. Heinen does not dispute the district court's assessment of his net worth at $1,258,113.65. The personal guaranty covers the value of computer assets and may not be enforced. The district court found that Heinen has the ability to pay the fine, and we conclude that finding is not clearly erroneous. Cf. United States v. Walker, 900 F.2d 1201, 1205-06 (8th Cir.1990).
 
 IV.
 
 48
 In a separate consolidated appeal, David Heinen appeals from the district court's modification of sentence. The district court held Heinen's sentencing on April 17, 1992. After imposing a thirty-month prison sentence, the district court stated:
 
 
 49
 It is further the order of the Court that the period of imprisonment will be followed by a three-year period of supervised released, [sic] subject to the following conditions: That you abide by the standard conditions of supervised release as recommended by the Sentencing Commission; that you own or possess no guns or dangerous weapons; that you commit no crimes, federal, state or local; and that you pay a fine in the sum of $250,000. It is further ordered that you pay immediately a special assessment in the sum of $1,400.
 
 
 50
 The April 17 judgment order similarly provided under the caption "SUPERVISED RELEASE," that "[u]pon release from imprisonment, the defendant shall be on supervised release for a term of [three years] and ... Defendant shall pay a fine of $250,000.00." Judgment at 3. The judgment also provided on the next page under the caption "FINE," that "defendant shall pay a fine of $250,000," and x's were placed in boxes so as to waive the interest requirement, and provide for the fine to "be paid ... in installments as set by [the] Probation Office." Id. at 4.
 
 
 51
 On April 22 the district court amended its judgment, leaving unchanged the provisions under the caption "SUPERVISED RELEASE," and changing only the next page under the caption "FINE," by placing an "x" in the box before the word "in full immediately," instead of the box indicating installment payments. Amended Judgment at 4. The district court entered the amended judgment without notice to Heinen or his counsel and without holding a hearing.
 
 
 52
 On July 16, 1992, Heinen filed a motion to vacate the amended judgment and reinstate the original judgment, and for a stay of execution of the fine. The district court granted the stay but conditioned it on Heinen's deposit of $250,000 cash or security bond. United States v. Heinen, No. 3-91-25(2) (D.Minn. July 21, 1992) (Order). On July 30, 1992, the district court lifted the stay and authorized the government to collect the fine because of Heinen's failure to deposit the bond. Heinen filed a notice of appeal on July 30, 1992.
 
 
 53
 Rule 36 of the Federal Rules of Criminal Procedure provides for the correction of "clerical mistakes" arising from "oversight or omission." Rule 35(c) provides for correction of a sentence "that was imposed as a result of arithmetical, technical, or other clear errors." Fed.R.Crim.P. 35(c). Rules 32 and 43 provide for the defendant's right to be present when a sentence is imposed or modified, and Rule 32.1(b) requires "[a] hearing and assistance of counsel ... before the terms of supervised release can be modified."
 
 
 54
 The government says that the district court properly corrected a clerical mistake and that no hearing or notice was required. The government states that the amended judgment did not represent a change in the district court's ruling from the sentencing hearing. The government contends the district court placed the corporate fine on an installment plan but made no similar provision for Heinen's individual fine, and thus, the district court made a clerical error in placing the individual fine on an installment plan. We do not so read the sentencing transcript. The court fined Data Hardware $500,000 and authorized the Probation Office to establish a payment schedule for Data Hardware. The payment schedule was ordered based on arguments of both the government and Data Hardware as to the effect a corporate fine would have on Data Hardware's continuing viability. It is true that there was no such discussion about placing Heinen's fine on an installment basis.[8] Indeed, the sentencing transcript and the judgment consistently order Heinen's fine as a condition of supervised release, and even the amended judgment so provides. The district judge in the sentencing proceedings explicitly provided that the period of imprisonment "will be followed" by supervised release subject to certain conditions, including payment of the fine. The written judgment entries, both in original form and as amended, provided that "[u]pon release from imprisonment, the defendant shall be on supervised release for a term of [three years]," with one of the conditions being the payment of the fine. The language is explicit that the fine comes after release from imprisonment. The language could not be more clear. The only change in the amended judgment is the removal of the "x" from the box that provides for the payment of the fine in installments and placement of an "x" in the box that provides for the fine to be paid "in full immediately." It can be argued that both the original judgment and the amended judgment have some inconsistencies that could be clarified, but no effort is made in the amended judgment to do so. The only change in the amended judgment is to make the fine payable immediately. We entertain no doubt that requiring payment of the fine immediately as opposed to in installments, is a change of substance, and is not the correction of a clerical error. Payment of $250,000 now is quite different from payment three years from now. The government's argument does not explain the actions taken or prove that the change was merely a minor clerical correction. Heinen was, therefore, entitled to notice and a hearing before the district court ordered the amendment to his judgment. Accordingly, we reverse the amended judgment, and order that the original judgment be reinstated. See United States v. Warden, 705 F.2d 189, 191 (7th Cir.1983) (vacating district court's extension of probation period ordered without notice or hearing). We order the United States to repay the $250,000 fine David Heinen paid under the order we now reverse.
 
 
 55
 The government also responds that this court lacks jurisdiction because of a defective notice of appeal. The government urges that Heinen's appeal from the July 21 order puts only that order in issue. We reject this argument. The July 21 order effectively denied the motion to vacate the amended judgment. Obviously, Heinen was not appealing from the court's grant of the stay.
 
 
 56
 The government also claims that Heinen has waived his right to challenge the amended judgment. The government says that Heinen waited three months to bring a motion to vacate the amended April 22 judgment making the fine due immediately. The government also contends that Heinen has "unclean hands," alleging that Heinen and his wife are trying to move assets beyond the government's reach. These issues have little to do with the amendment to judgment, and further demonstrate the need for the district court to provide notice and a hearing to Heinen before changing the terms of his judgment.
 
 
 57
 We affirm the convictions and sentences. We reverse the district court's order amending David Heinen's judgment, and remand with directions that the original judgment be reinstated, and that the United States pay $250,000 to David Heinen.
 
 
 
 [1]
 We will refer to Data Hardware, David Heinen, Robert Nelson, and Jeffrey Heinen collectively as Data Hardware
 
 
 [2]
 18 U.S.C.A. § 1341 provides:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office ... any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 
 
 [3]
 Although this panel cannot overrule United States v. Donahue, 539 F.2d 1131 (8th Cir.1976), its requirement that conspirators "contemplate the use of the mails" followed the Sixth Circuit's decision in Blue v. United States, 138 F.2d 351 (6th Cir.1943), cert. denied, 322 U.S. 736, 64 S.Ct. 1046, 88 L.Ed. 1570 (1944), which was reversed in United States v. Reed, 721 F.2d 1059 (6th Cir.1983). Like Blue, Donahue may be inconsistent with Pereira, which holds that specific intent to use the mails is not necessary to prove mail fraud so long as use of the mails can be reasonably foreseen. Pereira, 347 U.S. at 9, 74 S.Ct. at 363. Although the crime in Pereira was mail fraud, and not conspiracy to commit mail fraud, it follows that to sustain a conspiracy charge, the government need only prove that use of the mails was reasonably foreseen, not actually contemplated. See, e.g., Atlas Pile Driving Co., 886 F.2d at 992 (using foreseeability standard)
 
 
 [4]
 Although appellants couch their argument in terms of insufficiency of the evidence, we observe that the jury instruction did not incorporate the Donahue rule. The record reveals no objection to the instruction given, and the instruction complied with the Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, § 6.18.1341 (July 1989)
 
 
 [5]
 Jeffrey Heinen bases this statement on the fact that during jury deliberations, the jury sent a note to the judge that they had reached a verdict. Soon after sending out this note, the jury sent out another note that they were still deliberating and requesting more time. The jury also asked what they should do if they could not reach a verdict. Some three hours later, the jury returned a conviction on all charges against all defendants. Jeffrey Heinen's jury form apparently shows that the jury erased their initial "not guilty" verdicts. The "not guilty" verdicts were, of course, never returned or announced
 
 
 [6]
 We note that United States v. Kopp, 951 F.2d 521 (3rd Cir.1991), also pointed out that "loss" should be revised upward to the loss that defendant intended to inflict, if that amount is higher than actual loss. Id. at 536
 
 
 [7]
 The Fifth Circuit discussed the possibility of the government's "ratchet[ing] up" a sentence in a money laundering scheme in United States v. Richardson, 925 F.2d 112 (5th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2868, 115 L.Ed.2d 1034 (1991). The Fifth Circuit explained that a due process or separation of powers violation could occur in circumstances involving the executive branch's "unilateral power to directly and automatically ratchet up a sentence" based on the "amount of money that undercover agents bring to the table in a 'sting' operation." Id. at 117. No improper executive action occurred here, however, as the appellants' conduct established the amount of money paid and the duration of the scheme
 
 
 [8]
 The sentencing transcript reveals some confusion between the government and the court as to the payment terms of the personal and corporate fines:
 [ASSISTANT U.S. ATTORNEY]: And in addition to that, we feel it's also appropriate for David Heinen, the real person who wanted to gain by this crime, to pay a financial penalty for this crime, because it's that's [sic] kind of a financial penalty that will also deter this crime in the future.
 THE COURT: As I understand it, you are suggesting to the Court that the defendant be placed on probation for a period of years, and that as a special condition of the probation, there would be a fine of a certain amount? Is that your suggestion to the Court?
 [ASSISTANT U.S. ATTORNEY]: That's correct. It would be characterized as a fine, but you would impose a fine, but the fine would be made a condition of probation, allowing the option of both installment payments and modification of that condition of probation as the probation term goes on. And then yourself or Jay Meyer or whoever else can take a look at how this company is doing a year or two from now. I just do not believe that the jury's verdict entitles the corporation to stand here and because they have sincerely switched management to say that there should be no fine whatsoever.
 THE COURT: Very well.