Arzie Ellis, Jr., the appellant, was indicted for the murder of Harold Conner. He was convicted of manslaughter and was sentenced to ten year's imprisonment. The appellant's sentence was suspended and he was placed on probation. He was fined $10,000 and was ordered to pay $10,000 to the Crime Victims' Compensation Fund and to make restitution in the amount of $8,379.62. He raises seven issues on this direct appeal of that conviction.
 I
The appellant challenges both the sufficiency and the weight of the evidence, claiming that neither supports a conviction for manslaughter. The sufficiency issue has not been preserved for appellate review because at the close of the State's case, the appellant made the following motion:
 "I make a motion for a judgment of acquittal at this time, and my motion is that the State has just not proved that the defendant is guilty of murder. There may be some question about manslaughter, but there's just not sufficient evidence to go to the jury on the charge of murder." R. 261.
As this court observed in Washington v. State, 555 So.2d 347,348 (Ala.Cr.App. 1989):
 "The appellant's motion for judgment of acquittal for murder will not preserve for review the appellant's challenge to the sufficiency of the evidence for manslaughter. Where appellant specifically challenges the sufficiency of evidence of murder, and failed to object concerning manslaughter, he has waived this issue for review."
Even if this issue had been properly preserved, the appellant could not prevail on his claim. The evidence was clearly sufficient to present jury questions on the issues of murder, self-defense, and manslaughter. The appellant was the proprietor of the Turning Point, a lounge in Tuskegee, Alabama. In the early morning hours of July *Page 335 
26, 1991, a fight broke out between two patrons of the lounge, Jerry Thomas and Harold Conner. The appellant intervened to break up the fight, and he and Conner began to tussle. The appellant pulled a gun and shot Conner.
The testimony regarding whether Conner threatened the appellant, swung at the appellant, or was advancing on the appellant with a chair before the appellant shot him was in conflict. The evidence presented questions of fact that were correctly submitted to the jury. See McCain v. State,611 So.2d 1123, 1124-25 (Ala.Cr.App. 1992). A verdict rendered on conflicting evidence will not be overturned on appeal. "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." Johnson v. State,555 So.2d 818, 820 (Ala.Cr.App. 1989).
 "This court is not 'jury number two.' It is not the business of this court to second-guess juries. We hold that the jury's verdict was not contrary to the great weight of the evidence."
Smith v. State, 604 So.2d 434, 436 (Ala.Cr.App. 1992).
 II
At the time of his death, Harold Conner had in his pocket a plastic bag containing a "compressed, off-white material." R. 326. At trial, both the deputy coroner and the forensic toxicologist testified that the material appeared to be crackcocaine. However, testing had revealed that the material was not crack cocaine or any other controlled substance, but was instead "something like paraffin." R. 328. Defense counsel asked the toxicologist, "[H]ave you investigated cases where this type of substance has been sold as cocaine?" R. 328. The assistant district attorney objected to this question and the trial court sustained the objection.
The appellant argues that the question called for relevant evidence because the answer would have given the jury "an insight into the state of mind and character of Mr. Conner, i.e., [that] he was a person dealing in illegal drugs or counterfeits thereof. Such a person, particularly while under the influence of drugs, would be dangerous." Brief of Appellant at 49.
There was no error in the court's ruling on the objection. "[F]act A is relevant if there is any logical relationship between it and the ultimate inference B for which it is offered." C. Gamble, McElroy's Alabama Evidence, § 21.01(1) at 34 (4th ed. 1991). Although there is some logical relationship between the fact that the victim had a substance resembling cocaine in his pocket and the inference that he was a seller of counterfeit drugs (the victim could just as well have been a purchaser of the counterfeit substance), there is no logical relationship between the fact that the victim possessed a counterfeit controlled substance and the inference that the victim was either "under the influence of drugs" or "dangerous." See Winton v. State, 563 So.2d 22, 24 (Ala.Cr.App. 1990) (fact that murder victim sold cocaine irrelevant).
Furthermore, the appellant had the benefit of testimony by forensic toxicologist Laura Shevlin that, at the time of Conner's death, not only was Conner's blood alcohol content .18%, but also his
 "urine specimen was found to contain cocaine, . . . a number of metabolites of cocaine, [and] one metabolite of marihuana." R. 338.
Shevlin also gave the following testimony regarding Conner's use of cocaine prior to his death:
 "[The presence of cocaine metabolites in the urine] suggests that Mr. Conner . . . was not under the influence of cocaine at the time of his death. Cocaine, particularly crack cocaine, has an extremely short period when it is active in the body. Users of crack cocaine report that the high lasts only fifteen to twenty minutes, and in some cases less." R. 339.
"By not finding any cocaine in the blood, I can say that he was not under the influence of cocaine at the time [of his death], but he may have been as recently as thirty minutes toan hour beforehand." R. 340. *Page 336 
 "Q. [By Defense Counsel]: All right. But from the test you found, then Mr. Conner had been using crack or cocaine at some time not too remote from the time he died; is that right?
 "A. That's correct. There was quite a bit identified in the urine. It was a high level in the urine." R. 341-42.
 III
The appellant's character witness, an Alabama Alcoholic Beverage Control Board enforcement agent, testified that he had known the appellant for a number of years and that he had processed the appellant's application for a liquor license. He stated that the appellant's reputation for peace and quiet was good. On cross-examination, the witness testified, without objection by the defense, that he had had some complaints about the Turning Point lounge, the appellant's club.
On redirect, defense counsel asked whether the witness had ever substantiated any of the complaints about the appellant's club. The prosecutor objected and the court sustained the objection, commenting, "The club is not on trial here." R. 352-53. Defense counsel then moved to strike the testimony elicited earlier on cross-examination that there had been complaints about the club. The trial court denied that request.
"This was proper as a motion to exclude will not preserve error in the admission of evidence where no timely objection has been made at the time of its admission." Coon v. State,432 So.2d 558, 559 (Ala.Cr.App. 1983). Error cannot be predicated upon the court's failure to strike a witness's responsive answer to a question for which there was no objection. Milliganv. State, 208 Ala. 223, 227, 94 So. 169, 172 (1922).
 IV
The appellant contends that the State withheld exculpatory evidence from him, in violation of Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He claims that the trial court erred by failing to conduct an in camera inspection of the prosecutor's files to determine whether such evidence existed, and by failing to require a subpoenaed witness to testify at the hearing on his motion for a new trial.
Lanett police officer Michael Johnson was in the Turning Point lounge when the shooting occurred. Before trial, Officer Johnson told the appellant's attorney that he was present, that he saw the shooting, and that he "would have done the same thing [the appellant] did." R. 494. Defense counsel stated that he attempted to discuss the matter further with Officer Johnson, but Johnson refused to talk to him. At trial, Officer Johnson was subpoenaed as a State's witness, but he did not testify.
Theorizing that the State did not call Officer Johnson as a witness because Johnson had exculpatory information, defense counsel made a motion at the close of the State's case for the State to produce any statement made by Officer Johnson. The trial court denied that motion. Defense counsel then asked the court to conduct an in camera inspection of the prosecutor's file to determine if any exculpatory statement by Officer Johnson existed.
The assistant district attorney replied that he would be glad to show the court his file. The court inquired, "Do you have any exculpatory information that you have not disclosed?" and the prosecutor responded, "No, sir. In fact, this is the case that I allowed [defense counsel] to look at my file just before we got ready to go to trial." R. 263-64. The court then denied the motion for in camera inspection.
Defense counsel subpoenaed Officer Johnson for the hearing on his motion for a new trial. Johnson was served with the subpoena but he did not appear for the hearing. The appellant asked the court to send for Johnson and the court refused.
Before ruling that he would not send for Johnson, the court asked the assistant district attorney, "Do y'all have a statement made by Michael Johnson?" The prosecutor replied:
 "No sir. Your Honor, Mr. Johnson was equally uncooperative with us. I questioned Mr. Johnson. He would not — then *Page 337 
D.A.'s investigator Sid Lockhart subpoenaed him. He did not come down. He kept saying, 'I don't want to get involved.' I asked him point blank, 'Did you see anything? Do you know anything?' He said, 'No, I was drunk.' That's the extent of my conversation with him. "I said, 'Is there anything that you can add to this case? Can you give me anybody else that was there?' 'No.' And, from that point, Judge, I had an almost impossible time of finding him and talking to him. . . .
 "He was subpoenaed for the . . . trial. I had no intention of using him, but I still wanted him there. . . . I've had no contact with Michael Johnson, to my memory, since that day in the office. And there was nothing exculpatory or anything else that he produced. And further, [defense counsel] had talked to him. I have no statements from him." R. 497-98.
The trial court made the following findings of fact:
 "THE COURT: It would be my finding based on the district attorney's statement that there was no exculpatory evidence that was not turned over. . . . I think I understand. I think there is an explanation to [Officer Johnson's] reticence other than the fact that, an inference to be drawn other than the fact that the State — that there was some exculpatory material. I think that any time a police officer is in a place like [the Turning Point lounge], it's a little bit embarrassing in the first place. And particularly if he were drunk at that point in time, I think that it would be damaging to him as a police officer." R. 499-500.
To prove a Brady violation, the appellant must establish 1) that the prosecution suppressed evidence, 2) that the evidence was favorable to the defense, and 3) that the evidence was material. Ex parte Cammon, 578 So.2d 1089, 1091 (Ala. 1991); Exparte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert. denied,474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985):
"[T]he government's duty to provide information extends only to evidence in the possession of the prosecutor or reasonably available to him." United States v. Stuart, 923 F.2d 607, 612
(8th Cir.), cert. denied, 499 U.S. 967, 111 S.Ct. 1599,113 L.Ed.2d 662 (1991). Evidence is "reasonably available" to the prosecutor if it is known to him, it is contained in his own case file, or it can "be gained through reasonable inquiry of other prosecutorial personnel," State v. Siano, 216 Conn. 273,579 A.2d 79, 83 (1990), or if it is in the possession of a member of the " 'prosecution team," which includes both investigative and prosecutorial personnel,' " United States v.Meros, 866 F.2d 1304, 1309 (11th Cir.), cert. denied,493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989); accord O'Rarden v.State, 777 S.W.2d 455, 458 (Tex.App. 1989), and "anyone over whom [the prosecutor] has authority," Meros, 866 F.2d at 1309.
In the present case, Officer Johnson expressed an exculpatory opinion to defense counsel. The State obviously did not "suppress" this information. If Officer Johnson hadmore exculpatory information that he did not reveal, we do not believe that the State can be charged with a Brady violation for Officer Johnson's failure to disclose it. Officer Johnson was not, for purposes of this case, a member of the "prosecution team." He was, instead, "uncooperative" with the prosecutor and stated that he did not want to "get involved." R. 497. Compare Craig v. State, 76 Md. App. 250, 544 A.2d 784,790 (1988), reversed on other grounds, 316 Md. 551,560 A.2d 1120 (1989), vacated on other grounds, 497 U.S. 836,110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) ("close cooperation" between sexual assault counselor and office of state's attorney made counselor a member of the "prosecution team"), with Brown v.State, 261 Ga. 66, 401 S.E.2d 492, 495 cert. denied, ___ U.S. ___, 112 S.Ct. 296, 116 L.Ed.2d 240 (1991) (psychiatrist not a member of the "prosecution team"). See generally Donahoo v.State, 552 So.2d 887, 896 (Ala.Cr.App. 1989) (information that police officer had a prior felony conviction could not be imputed to the prosecutor).
 "[The] actions of police officers, who are members of a prosecution team, are attributable to the prosecution, . . . [however, the] actions taken by such officers not in *Page 338 
furtherance of law enforcement but rather in pursuit of a . . . scheme of their own . . . are [not] attributable to the prosecution."
Commonwealth v. Waters, 410 Mass. 224, 571 N.E.2d 399, 402
(1991).
The record supports the court's finding that Officer Johnson had no exculpatory information other than what he revealed to defense counsel (that the officer was present in the lounge, that he saw the shooting, and that he "would have done the same thing [the appellant] did." R. 494). However, if Officer Johnson did have more exculpatory information, his failure to disclose it did not constitute a Brady violation because, as the trial court found, Johnson's reason for nondisclosure was a personal desire to shield himself from embarrassment rather than a reason that could be imputed to the prosecutor. As the Massachusetts court observed, for actions
 "motivated by the officers' interest in shielding themselves from the possible consequences of having visited the [defendant's place of business] for an unlawful purpose or by some other motive unrelated to law enforcement, it cannot reasonably be said that . . . the officers were functioning as representatives of the State.
 ". . . It is one thing to attribute to the prosecution the efforts of police officers to . . . withhold pre-trial information from a defendant because of overzealousness or sloppy police work. . . . It would be quite another matter, however, to attribute to the prosecution the conduct of police officers in pursuit of their own individual . . . scheme unrelated to the Commonwealth's interest in law enforcement."
Commonwealth v. Waters, 571 N.E.2d at 402-03.
The record supports the court's finding that Johnson was reluctant to testify in this case not because he had further exculpatory information, but because he was embarrassed about being present and intoxicated in a lounge where a homicide occurred.
The trial court did not err by refusing to conduct an in camera inspection of the prosecutor's file or by refusing to send for Officer Johnson to testify at the hearing on motion for new trial.
 V
There is no merit to the appellant's contention that the State violated Brady by failing to disclose impeachment information contained in the personnel file of Tuskegee Police Sgt. Michael Clements.
At the hearing on the appellant's motion for a new trial, the Tuskegee chief of police brought Sgt. Clements's personnel file from the Tuskegee Police Department. The trial court examined the file and found nothing exculpatory. The appellant's attorney then requested the court to review, in camera, another file relating to Sgt. Clements kept at city hall. The court denied that request when the chief of police informed him that the city hall file contained duplicates of the material maintained by the police department.
The court's ruling was correct. There was absolutely no showing that the prosecution "suppressed" any information regarding Sgt. Clements. See Ex parte Cammon, supra; Ex parteKennedy, supra.
 VI
The appellant contends that this cause should be remanded for a new restitution hearing because the sentencing judge used restitution as a means of punishment, in violation of Ex parteClare, 456 So.2d 357 (Ala. 1984). In Clare, the Alabama Supreme Court declared that "[t]he legislative intent of the restitution statute is to compensate, and not to punish." 456 So.2d at 358.
The sentencing judge's imposition of a large fine and a high Crime Victim's Compensation Fund assessment was clearly a punitive measure.[1] However, there is no *Page 339 
support in the record for the appellant's contention that the restitution order was punitive rather than compensatory. At the sentencing hearing, the trial judge heard testimony from the victim's parents that they had suffered financial losses as a result of the death of their son in the amount of $8,379.62, representing "funeral expenses, doctors' bills not only for the victim, Mr. Conner, but as well the immediate doctor bills of the family during their time of bereavement, [and] the lost wages during their absence [from work]." R. 478. The court awarded restitution in the amount of $8,379.62, a figure obviously intended by the court "to fully compensate all victims of [the appellant's criminal] activity for any pecuniary loss, damage or injury as a direct or indirect result thereof." Ala. Code 1975, § 15-18-65 (emphasis added). See Kyserv. State, 513 So.2d 68, 73 (Ala.Cr.App. 1987) (burial expenses, medical expenses, and lost wages suffered by manslaughter victim's mother, father, and brother proper).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] The court's order on motion for reconsideration of sentence reads as follows:
 "The primary punishment meted out to the defendant for his conviction of manslaughter was a heavy financial obligation which, in the judgment of the Court, the Defendant will be able to pay over a period of time, if not immediately, through the liquidation of assets. The Court saw fit to impose a heavy burden in lieu of prison time because of the following considerations:
 "1) It appears to the Court that there is small likelihood the defendant would engage in other violent activities.
 "2) The taking of a human life is a very serious matter and the heavy financial obligation in lieu of a jail sentence will be of benefit to the State, to other victims and to the victims in this case." C.R. 69-70.