## Commonwealth *vs.* Patricio Santiago.

Bristol. September 14, 2010. - December 7, 2010.

Present: Marshall, C.J., Ireland, Spina, Cordy, Botsford, & Gants, JJ.

*Homicide. Due Process of Law,* Conduct of prosecutor. *Practice, Criminal,* Capital case, Conduct of prosecutor, New trial, Judicial discretion, Affidavit.

At a murder trial, no substantial likelihood of a miscarriage of justice arose from a question asked of a witness by the prosecutor (i.e., whether there was a reason the witness was afraid to recall what he had said to police), and the judge did not abuse his discretion in denying thereafter defense counsel's request for a specific, curative jury instruction, where the single question was not so provocative as to warrant a curative instruction at the time it was asked, where the judge sustained the defendant's objection to the question before the witness could respond, and where the judge was warranted in concluding that the belated request for a curative instruction might inappropriately emphasize the issue; further, where there was no showing of bad faith by the prosecutor, and the judge correctly instructed the jury before the taking of evidence and in his final charge that questions of counsel were not evidence, the defendant failed to establish a violation of his right to due process under the Fourteenth Amendment to the United States Constitution. [411-413]

A trial court judge did not abuse his discretion in denying, without an evidentiary hearing, a criminal defendant's motion for new trial, which was based on allegedly newly discovered evidence consisting of an affidavit of a witness recanting his testimony at trial that identified the defendant as the person he saw holding a knife when the victim was stabbed, where the judge was warranted in concluding that the affidavit was unbelievable and untrustworthy, and where the judge did not improperly rely on blood evidence from the trial in concluding that there was no substantial risk a jury provided with the witness's "new" testimony would reach a different result. [413-417]

INDICTMENT found and returned in the Superior Court Department on December 19, 2003.

The case was tried before *Robert C. Rufo,* J., and a motion for a new trial, filed on Februrary 26, 2009, was heard by him.

*David H. Mirsky* for the defendant.

*Rachel J. Eisenhaure,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. On January 18, 2006, a jury convicted the defend-ant, Patricio Santiago, of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.[1] Represented by new counsel following his conviction, the defendant argues (1) prosecutorial misconduct during the direct examination of a witness; and (2) error in the denial of his motion for a new trial. We affirm the defendant's conviction and the order denying his motion for a new trial. We discern no basis to exercise our authority under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. On the evening of October 31, 2003, which was Halloween, Allan Anthony Monteiro, Peter Ruby, Anthony Francisco Faria, Jr.,[2] and Michael White (victim), a close friend of Monteiro, went out together to celebrate Monteiro's birthday. They met at Monteiro's sister's house. The men went to the Dream Café, a bar on Acushnet Avenue in New Bedford, arriving at approxi-mately 11 P.M.

Joseph Santos was checking the identification cards of patrons as they entered the front door (the only door for patrons) to the bar. Inside there was a bar and an area in which there were two pool tables, as well as some tables and chairs. That evening the bar was more crowded than usual because it was Halloween and there was a professional baseball game being televised. By 10 P.M., the bar and pool table area were very crowded.

Once inside the Dream Café, Faria went to the bar to get some drinks. He then joined Monteiro and the victim to play some pool. Ruby watched television.

In the pool room, Monteiro saw the defendant,[3] whom he knew from having grown up "in the same area."[4] The defend-ant had arrived at the bar that night at about 10 P.M. with about five or six friends. Monteiro went to one table and played pool with a man who had just won a game. During the game, that

---

[1]The defendant's first trial ended in a mistrial.

[2]The trial transcript appears to contain an erroneous spelling of this witness's surname. We refer to this witness as Faria.

[3]According to a bartender who testified for the Commonwealth, the defend-ant was wearing a plain white, short-sleeved T-shirt with no markings.

[4]Monteiro grew up in "Brickenwood" (there was no evidence concerning what "Brickenwood" is) and the defendant grew up in "Presidential Heights," which is a "housing project" in New Bedford.

man, along with some other men who were watching, and whom the defendant appeared to be with, made some unspecified "wise remarks." Monteiro lost the game and told the victim, who was next up to play, that he no longer wished to play at that table. Monteiro proceeded to play pool at the other table with Faria and two women. The victim stayed to play against the same man who had played Monteiro.

Monteiro left to make a telephone call. When he returned, the victim met him at the pool table that Monteiro and Faria had been using. One of the men in the group with the defendant went over to the victim and said something to him, starting a verbal altercation. The victim moved away, but the man returned,[5] with a friend, and punched the victim.

Santos quickly moved in, grabbed the victim from behind, and ejected him from the bar. While doing so, a different man was trying to punch the victim. About ten to fifteen people followed the victim outside the bar after he was thrown out. On the sidewalk, just outside the door to the bar, several of the men surrounded the victim and began beating him. Santos shut the door and attempted to block others from leaving. Monteiro, however, was able to get by Santos.

Monteiro was attempting to stop the beating of the victim. He yelled for the men to stop and physically tried to push some of the men off of and away from the victim. While doing so, Monteiro saw the defendant approach the fight. Monteiro observed that the defendant was holding a knife and watched as the defendant "thrust [the knife] into the pile." The defendant did this "a couple" of times. Then, the men surrounding the victim "gathered up" and dispersed, running across the street toward a parking lot at a Brooks Pharmacy.

Faria, who was not able to leave the Dream Café until after Monteiro, testified about his observations once he was outside. Faria saw the defendant and that the defendant was holding a knife "tucked under his arm." Faria watched the defendant go

---

[5]Monteiro described him as a short and husky man who wore a "dress shirt" on which there was "some kind of design" in a dark color and with some red in it.

into the pile with the victim.[6] Then he watched everyone take off running.

There was blood on the ground near the victim. Monteiro went over to him, grabbed his hand, and yelled for someone to call an ambulance. Ruby was finally able to leave the bar. When he got outside, he saw Monteiro with the victim in between a van and a white automobile. Monteiro walked the victim over to the automobile. The victim's eyes rolled back, and he slumped down alongside the automobile, leaving blood smears along its side. The victim then fell face forward to the ground. Monteiro moved the victim onto his back. The victim was "gurgling," and blood was "pouring out" of him. Monteiro instructed Faria to get the automobile, which was in the Brooks Pharmacy parking lot across the street. When Faria returned with the automobile, Monteiro and Ruby got inside and left. Monteiro wanted to go to "Presidential," see note 4, *supra*, but Faria drove back to Monteiro's sister's home.

Police arrived shortly after Monteiro, Faria, and Ruby had left. They found the victim lying on his back on the sidewalk outside the Dream Café. He was taking shallow breaths and was bleeding. A detective used "trauma pads" in an attempt to stop the bleeding. At one point, the victim made a loud gasp and stopped breathing. Emergency medical technicians arrived and took over the medical care. The victim died at the scene as a result of multiple stab wounds, including wounds to his back and chest. He also had numerous abrasions on his face and extremities.

After the victim's stabbing, police questioned various individuals. Monteiro first lied to them and told them he "didn't see nobody" because he needed to "protect" his children, "was scared," and "[j]ust didn't want the problems." Eventually he told them that the defendant was the person with the knife and identified the defendant in a photographic array as the man who had thrust the knife into the pile with the victim.[7]

---

[6] Faria made an in-court identification of the defendant as the person whom he had seen with the knife.

[7] During cross-examination at trial, Monteiro admitted that he told police that the defendant was short and husky, and had been wearing a long-sleeved shirt that was white. He was impeached with a prior statement he made to a

Faria also spoke with police. From a photographic array, he identified the defendant as the man with the knife.[8]

A patron of the bar and a friend of Santos, Timothy Pereira, told police that the group of men who were beating up the victim outside the bar were from the "Presidential Heights" housing project, see note 4, *supra*. Pereira identified the defendant from a photographic array as one of the men who had been involved in the fight with the victim outside the bar.[9]

On November 3, 2003, the defendant, after being taken into custody and after waiving his Miranda rights, agreed to speak with police. The defendant stated the following. He had been at the Dream Café on October 31, 2003. He had arrived at approximately 11:30 P.M. and stayed for only about ten minutes. The defendant had one drink, spoke with one friend, and said hello to "some girls." The defendant recounted that he went to purchase some gasoline and then went to another bar, the Highlander, which was one block away. There the defendant had one drink with his cousin, left after closing at around 2 A.M., and thereafter went to his mother's house to sleep. While he was at the Dream Café, nothing remarkable had occurred, and he had not been inside the pool table area. The defendant recalled that he had been wearing gold hoop earrings, a white shirt, and dark blue jeans.

Police subsequently interviewed two employees of the Highlander and showed them photographic arrays containing the defendant's photograph. Neither employee recognized the

State trooper that a man in a "red colored wind breaker type jacket" was the man who had the knife. He also was impeached with a prior drug distribution conviction.

[8]At trial, Faria was impeached with a statement he made to police that the man who punched the victim inside the bar was the same man who had the knife. This man, Faria told police, was large and had been wearing a black hat, red bandana, and red shirt. Defense counsel also brought out during cross-examination that Faria was currently facing serious criminal charges (brought by the Bristol County district attorney's office) with a possible life sentence. Faria testified, however, that he was told by the prosecution that he was not going to receive any leniency or anything else in exchange for his testimony at the defendant's trial.

[9]At trial, Pereira testified that he identified the defendant only as a person who had been inside the Dream Café that night.

defendant as having been a patron at the Highlander on the night of October 31, or the early morning of November 1.

It was stipulated that the victim's blood was recovered from the exterior of a truck in the parking lot at Brooks Pharmacy, which was across the street from the Dream Café. Pursuant to a warrant, police searched the defendant's automobile and recovered, from the front passenger side carpet, blood from which the deoxyribonucleic acid profile obtained "matched" the victim's.

The defendant did not testify. His trial counsel called one witness, Santos, who testified that the defendant had not been involved in the fight with the victim. The defendant's trial counsel argued that the defendant had not been involved in the fight and that there was a lack of physical evidence against him because no blood was recovered from his clothing or from the driver's side of his automobile. Defense counsel argued that the police investigation was flawed, and that witnesses were not credible because they had lied to police and were inconsistent with their descriptions of the man who held the knife. Defense counsel also pointed out a lack of motive.

2. *Alleged prosecutorial misconduct.* Ruby was called as a witness by the Commonwealth. Although he testified that he had heard a fight inside the pool table area, had seen the victim being ejected from the bar, and had observed Monteiro leaving the bar after the victim had been ejected, he did not implicate the defendant in the fight that took place inside or outside the bar. From his account, Ruby was inside the bar while the victim was being attacked outside, and did not go outside until after the stabbing had occurred. Ruby testified that he did not recognize anyone in the court room as having been inside or outside the bar prior to or after the stabbing.

The prosecutor asked Ruby during his direct examination if he recalled speaking with police after the stabbing. Ruby recalled speaking with police, but stated that he did not recall what he had told them. The prosecutor attempted to refresh his recollection with a police report,[10] but Ruby testified, "I don't remember that." The prosecutor asked, "Is there a reason you're afraid to

---

[10]The content of the police report was not marked for identification at trial or otherwise disclosed to the judge. A copy was provided to us after oral

say that?" Defense counsel objected, and the judge sustained the objection. The prosecutor moved to a different line of questioning. When the prosecutor concluded her examination, defense counsel requested a sidebar conference and told the judge that the prosecutor's question concerning Ruby's being "afraid" was "completely inappropriate" and was intended to inflame the jury. Defense counsel asked the judge to instruct the jury "again that questioning of the witnesses [is not] evidence." The prosecutor stated that she had not asked the question to inflame the jury and that the question was not "without basis." The judge stated that the question was "misplaced," and he noted that he had already sustained the defendant's objection. He ruled that his instruction prior to the commencement of the questioning of the prosecutor's first witness, that the questions of attorneys are not evidence, which he stated he would repeat in his final charge (and did), would appropriately guide the jury. The judge remarked that he did not want to bring the issue to the attention of the jury after the matter had passed. The judge asked the prosecutor to request a sidebar conference if she anticipated that the issue would arise again.

The defendant argues that reversal is required because the prosecutor's question about Ruby being "afraid" improperly suggested that Ruby's failure to identify the defendant as the perpetrator was the result of coercion. The defendant also contends that reversal is warranted because the judge denied his trial counsel's request for a specific, curative jury instruction. The defendant asserts that the prosecutor's question so infected the trial with unfairness that it rendered the conviction a violation of his right to due process under the Fourteenth Amendment to the United States constitution. We reject these arguments.

"In general, questions concerning a witness's fear of testifying are appropriate in the judge's discretion." *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 412 (1978), citing *Commonwealth* v. *White*, 367 Mass. 280, 284 (1975). There must be a good faith basis for such a question, and a prosecutor should be prepared

argument. The report reflects that, on November 1, 2003, Ruby gave police a description of the man who punched the victim inside the bar, and provided a description of one man he had seen outside the bar. Ruby told police that he had not seen the victim get stabbed.

to disclose the basis to the judge. *Commonwealth* v. *White*, *supra*. The questions must also have an evidentiary basis, as we have stated that "[t]he attempt to communicate impressions by innuendo through questions which are answered in the negative, . . . when the questioner has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts." *Id.*, quoting ABA Standards Relating to the Prosecution Function § 5.7(d) (Approved Draft 1971). In circumstances where such questions are permissible and there is "no showing that they were put in bad faith or without foundation," we have concluded that there is no denial of a fair trial on due process grounds. *Id.* at 283 n.3 & 284-285.

As an initial matter, the prosecutor's question did not rise to the level of insinuating that Ruby was under coercion, as claimed by the defendant. Instead, her question suggested only fear, a permissible topic of inquiry generally, see *Commonwealth* v. *Fitzgerald*, *supra*, and the question did not, on its face, attribute any possible fear to the defendant.

We conclude that the judge did not abuse his discretion in handling the matter. In any event, there was no substantial likelihood of a miscarriage of justice. There was no need for the prosecutor to make a proffer concerning the evidentiary basis for her question because the judge immediately sustained the defendant's objection to the question.[11] Thus, we need not address whether it was an error for the prosecutor to ask the question. In addition, there was no need for the judge to provide a curative instruction because he had sustained the objection and the witness had not answered the question, and the question was not so provocative as to require a curative instruction. The judge previously had instructed the jury that the questions of counsel are not evidence, and the prosecutor did not repeat the isolated question and continued to a different line of questioning.

[11]Where there later was a discussion that took place at sidebar at the conclusion of Ruby's direct examination, a proffer made on the record, although not required in view of the judge's sustaining the objection, may have been helpful on appeal and is not to be discouraged. Although Monteiro had not yet testified, the prosecutor and defense counsel (but not the judge) were aware of Monteiro's prior trial testimony that he initially lied to police out of fear. Thus, there was an element of fear that existed, although not connected to Ruby.

The defendant argues that the judge abused his discretion in refusing to give the curative instruction requested by his trial counsel at the sidebar conference that the questions of counsel are not evidence. The request was late. It was made not at the time of the objection but, rather, after the prosecutor's conclusion of her direct examination. The judge had sustained the objection, and the prosecutor changed her line of questioning thereafter. Consequently, the timing of the request provided a sound basis for the judge to conclude that the requested instruction, at that time, would inappropriately emphasize the matter. Also, the judge previously had instructed the jury, before the prosecutor questioned her first witness, that the questions of counsel do not constitute evidence, and the judge indicated he would repeat this instruction in his final charge (which he did). We conclude that the judge did not abuse his discretion in refusing to give the requested instruction. Cf. *Commonwealth* v. *Waite*, 422 Mass. 792, 799-800 (1996) (no error in judge's treatment of prosecutor's question that potentially implicated defendant's right to silence where judge immediately sustained objection, no testimony regarding defendant's silence was offered, and judge decided not to call further attention to issue by way of curative instruction).

We reject the defendant's assertion that the prosecutor's question so infected his trial with unfairness that it amounted to a due process violation. As previously explained, the single question was not so provocative as to warrant a curative instruction at the time it was asked; the defendant's objection to the question immediately was sustained; there was no answer to the question; and the judge was warranted in concluding that the belated request for a curative instruction might inappropriately emphasize the issue. In addition, there was no showing of bad faith by the prosecutor, and the judge correctly instructed the jury before the evidence was taken, as well as in his final charge, that the questions of counsel are not evidence. For these reasons, there was no due process violation. See *Commonwealth* v. *White*, *supra* at 284-285.

3. *Motion for a new trial.* In February, 2009, the defendant filed a motion for a new trial based on allegedly newly discovered evidence consisting of an affidavit signed by Faria on December

10, 2008, while serving a twenty-year prison sentence in connection with charges brought by the Bristol County district attorney's office. In his affidavit, Faria recanted his trial testimony identifying the defendant as the person who stabbed the victim. Faria stated that, although the defendant had been inside the Dream Café the night on which the victim had been stabbed, he (Faria) did not know who stabbed the victim. Faria claimed that he lied at trial because he "wanted someone to pay for doing it," and because the police had pressured him to provide a name. Faria went on to say that the person who had punched the victim inside the bar was not the defendant, and that outside the bar he had seen a man who was "skinnier" than the defendant with "something shiny" in his hand, but did not know if the object was a knife. The person with the shiny object joined in the group who were beating up the victim. According to Faria, he did not observe the defendant in this group. In his affidavit, Faria states that his conscience had been bothering him about "sending someone who may be innocent to jail."

The motion judge, who was the trial judge, denied the motion without an evidentiary hearing in a comprehensive memorandum of decision. The judge determined that Faria's affidavit was "utterly lacking in credibility," and that the content of Faria's affidavit did not create a substantial risk that the jury would have reached a different conclusion had the "newly discovered" evidence been admitted at trial.

We reject the defendant's assertion that the judge abused his discretion in denying the motion. In the absence of constitutional error, the granting of a motion for a new trial on the ground of newly discovered evidence rests in the sound discretion of the judge. *Commonwealth* v. *Brown*, 378 Mass. 165, 170-171 (1979). "Reversal for abuse of discretion is particularly rare where [as here] the judge acting on the motion was also the trial judge," *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990), and is in the best position to weigh the credibility of the proffered evidence and to determine its probable impact on a jury hearing it with all the other evidence. See *Commonwealth* v. *Brown*, *supra* at 172. The abuse of discretion standard is not altered when the newly discovered evidence is an alleged recantation by a material witness. *Commonwealth* v. *Waters*, 410 Mass. 224, 231 (1991).

In these circumstances, "the duty of the trial judge is to give grave consideration to the credibility of the witness's new testimony," *Commonwealth* v. *Robertson*, 357 Mass. 559, 562 (1970), and the judge may appropriately consider whether, if the witness "were to testify at a new trial, his credibility would be damaged in such a way by earlier testimony that his new testimony would be relatively worthless," *Commonwealth* v. *Ortiz*, 393 Mass. 523, 537 (1984). At all times, the underlying principles governing a motion for a new trial predicated on newly discovered evidence remain in force as set forth in *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986):

> "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction. . . . The evidence said to be new not only must be material and credible . . . but also must carry a measure of strength in support of the defendant's position. . . . Thus newly discovered evidence that is cumulative of evidence admitted at trial tends to carry less weight than new evidence that is different in kind. . . . Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. . . . The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations. . . . This process of judicial analysis requires a thorough knowledge of the trial proceedings . . . and can, of course, be aided by a trial judge's observation of events at trial. . . ." (Citations omitted.)

The defendant challenges the judge's credibility determination, claiming that the judge improperly speculated as to Faria's motives for recanting his trial testimony by suggesting that Faria did so because he bears hostility toward the Bristol County district attorney's office for denying him leniency at the time of the defendant's trial in connection with the criminal charges Faria then faced. In addition, even though a videotape recording of Faria's statement to police did not show any police coercion, the defendant argues that the coercion may have occurred prior

to the time the recording was made. In support of this contention, the defendant relies on Monteiro's trial testimony that he (Monteiro) had been subjected to coercive interrogation, which, the defendant asserts, corroborates the possibility that Faria was also subjected to police coercion. Last, the defendant argues that the judge improperly relied on the blood evidence in concluding that Faria's recantation would not constitute material evidence at a new trial. The defendant states that because there was evidence at trial concerning the presence of an enormous amount of blood of the victim outside the bar, the victim's blood found in the defendant's automobile "would only have shown that someone who had been in [the defendant's automobile] may have been outside the Dream Café that night."

Nothing in the record warrants disturbing the judge's conclusion that Faria's affidavit lacked credibility. Even if the judge believed that Monteiro had been subjected to a coercive interrogation by police, he was not compelled to draw the same conclusion with respect to Faria. In addition, it was not improper for the judge to question Faria's motivation in recanting his trial testimony. See *Commonwealth* v. *Ortiz, supra.* Further, the judge's suggestion that Faria "likely bears hostility" toward the Bristol County district attorney's office was not the predominant factor influencing his credibility determination. The judge relied on several other factors, including the fact that Faria's testimony that he saw the defendant with a knife was consistent at both of the defendant's trials. In addition, the judge based his conclusion on the fact that Faria's trial testimony was consistent with his recorded statement to police and was corroborated by Monteiro's testimony and by the blood evidence recovered from the defendant's automobile. The judge was warranted in concluding that Faria's affidavit is unbelievable and untrustworthy.

In concluding that there was no "substantial risk," see *Commonwealth* v. *Grace, supra* at 306, that a jury provided with Faria's "new" testimony would reach a different result, the judge did not improperly rely on the blood evidence. The blood evidence warranted a reasonable inference that the defendant was involved in the stabbing, particularly in view of the defendant's own statements to police that he had left the Dream Café before the altercation with the victim occurred. That another

inference could also have been drawn from the blood evidence was for the defendant to argue (and for the jury to decide). His trial counsel did just that in his closing argument, suggesting that the lack of blood on the defendant's clothing and in the driver's area of his automobile (and the existence of blood evidence only in the passenger area of his automobile) suggested that the defendant was not the person who stabbed the victim. The consideration of the possible inferences from this evidence is not "new." Further, the judge did not rely solely on the blood evidence. He based his decision on Monteiro's identification, which bore a measure of strength because Monteiro had known the defendant prior to the stabbing. He also pointed to evidence casting doubt on the defendant's alibi. We add that there was evidence that Pereira had identified the defendant from a photographic array as being one of the men who had been involved in the fight with the victim outside the bar. Finally, as aptly considered by the judge, based on Faria's consistent testimony at both of the defendant's trials, and his prior statement to police, were Faria to testify at a new trial, it is likely that he would be impeached with his prior testimony and statements such that his credibility would be so impaired that his "new" testimony would be "relatively worthless." See *Commonwealth* v. *Waters, supra.* For these reasons, we conclude that the defendant's "new evidence" does not cast "real doubt on the justice of the conviction," *Commonwealth* v. *Grace, supra* at 305. The judge did not abuse his discretion in denying the defendant's motion for a new trial.

4. *G. L. c. 278, § 33E.* There is no basis for relief under G. L. c. 278, § 33E.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*