After a jury trial in Superior Court, the defendant was convicted of kidnapping, intimidation of a witness, and three counts of assault and battery, charges that relate to events that occurred between May 3, 2011, and May 4, 2011. The defendant was acquitted of fourteen additional counts, some of which were alleged to have occurred on different dates.[2] The defendant moved for a new trial and after conducting an evidentiary hearing, the trial judge denied the motion. The appeal from the motion was consolidated with the defendant's direct appeal. On appeal the defendant argues that (1) the judge abused her discretion in denying the motion for new trial based on ineffective assistance of counsel, (2) the judge improperly denied the defendant's request for a missing witness instruction, and (3) the prosecutor improperly cross-examined the defendant.
Background. We briefly summarize the facts the jury could have found leaving certain details for discussion with the issues raised. The defendant, who immigrated to the United States from Haiti, was a United States citizen when he began online communication with the victim, who lived in Haiti. They met twice in Haiti before the defendant proposed. The victim moved into the defendant's apartment in Arkansas, in May, 2010, and they were married in June, 2010. Within eight days of moving to Arkansas the defendant began verbally and physically abusing the victim. The victim became pregnant and following a brief separation, the victim moved into a two-bedroom Brockton apartment with the defendant after she gave birth to twins in February, 2011.
On May 3, 2011, the defendant returned home from work and an argument erupted over the victim's use of the prepaid cellular telephone (cell phone) the defendant had provided to her and the possibility that she had used the prepaid minutes too quickly. The children were present in the home throughout the incident. The defendant told the victim that she does not want what he wants and that he would take the children to Haiti. He held out his cell phone and told her to call her mother to come pick her up.
The victim dialed her mother's telephone number and put the telephone on speaker as the defendant put his hand on her neck and pushed her over one of the infant's portable cribs, causing it to break; he began hitting and punching her. She reached into his pocket, where he put his cell phone, but he stopped her by biting her left hand. He warned her that she would not be able to "call 911 if [he] destroy[ed] her hand" and that even if she does reach the police, because he knows the system, "he will pay something and get release[d]."
At some point after he bit her hand, the victim tried to get to the apartment entrance from the bathroom but the defendant grabbed her, held her inside the bathroom, and struck her head on the faucet. During the altercation, the victim's mother called the defendant's cell phone and he answered it. As he spoke to her, the victim went to the back door and gestured to a passing teenager for help, but the boy ignored her. The defendant went out the back door, onto the back porch, to continue the conversation, shutting the victim inside. The victim heard him say he will "break" anyone who comes there. When he hung up, at around 9:00 P.M. or 10:00 P.M. , the defendant took the victim's purse that contained her passport and other documents and locked it in a closet to which only he had a key.
Although the altercation de-escalated for a period of time, when the defendant saw the victim trying to go out the front door shortly after midnight, he grabbed her and began hitting her, causing a cut near her left eye that bled. The defendant dragged her into the bedroom and continued hitting her, and blood started to get on the crib, the floor, and the wall. He told her to go wash her face. The defendant found their marriage certificate in the locked closet and ripped it up and told her he was finished with her.
The defendant ordered her to get into bed so he could "fuck [her] the last time ...." He did not acknowledge her refusal and when she asked him to use a condom, he said, "No." He put his hand on the back of her neck and forced her forward. After they had sexual intercourse, he grabbed a knife from the kitchen and put it under the mattress and went to sleep. The victim laid down next to him but was unable to sleep. At daylight, the defendant told her he did not want her there when he came home and then went to work. The victim was able to get the attention of a passerby and shortly thereafter, a police officer arrived at her door.
The officer described the victim as shaken, crying, and very upset. He observed a cut on her eye and abrasions and cuts on top of her hand. The apartment was in disarray and police observed a broken crib, and upon their return a week later, reddish brown stains on the bedroom wall, a broken cell phone, and a kitchen knife under the mattress. Firemen were summonsed to take the door off the locked closet. Inside the closet, police found the victim's passport and ripped-up marriage certificate.
Emergency workers arrived and transported the victim and her children to the emergency room at Good Samaritan Hospital. Evidence that included testimony, medical records, and photographs showed that the victim had redness around her neck, an abrasion and scar on her forehead, new and old bruises on her left hand, new bruises on her right hand, a bite mark, swollen and red eyes, a scab over the left eye and under her lip, redness on the back of her left arm, and a bruise on her left shin.
The victim's bloodied dress and the tee shirt the defendant was wearing on May 4, 2011, with what appeared to be a blood stain on it were admitted in evidence.
The defendant spoke to police and testified that a pushing match had ensued from an argument over her use of prepaid cell phone minutes and that during the fight, the two of them fell over the crib. He admitted biting her and that she sprained her neck when he pushed her into the crib. A police officer testified that the defendant admitted he had refused to wear a condom, but the defendant testified and he denied he made that statement.
Discussion. 1. Denial of motion for new trial. On appeal of a ruling on a motion for a new trial, we review for "whether there has been a significant error of law or other abuse of discretion," and we "extend[ ] special deference to the action of a motion judge who was also the trial judge," as was the case here. Commonwealth v. Grace, 397 Mass. 303, 307 (1986). In his motion, the defendant asserted that trial counsel was ineffective for failing to redact certain portions of the victim's medical records, to seek a new interpreter or in the alternative, a mistrial, and to request a curative instruction for the defendant's outburst. We discuss the asserted grounds in order.
a. Redaction of medical records. The defendant points to the following scattered references, some of which were repeated up to three times, on twelve pages of an approximately sixty-nine page medical record, and claims that counsel was ineffective for failing to include them among her other requests for redaction. The challenged references are to "assault," "assault by human bite," "SP assault," "domestic violence case," "social assault domestic evidence," "physically hurt by husband," "assaultive behavior," "assailant held her by neck," "children present during assault," "hands around neck," "hit head off crib," "punching in eye, in stomach." The judge correctly found that the last three references were properly admitted "as fact specific references to the reported cause of [the victim's] injuries." See, e.g., Commonwealth v. Dargon, 457 Mass. 387, 396 (2010). The judge also correctly concluded that the remaining terms should have been redacted. See, e.g., ibr.US_Case_Law.Schema.Case_Body:v1">id. at 397. Because the failure to redact the language satisfies the first prong of the ineffective assistance standard, we turn to a consideration whether the failure to do so deprived the defendant "of an otherwise available, substantial ground of defence." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). We agree with the judge that it did not.
The language at issue is relevant only to the three assault and battery charges and those charges were supported not only by the victim's detailed testimony but by significant other independent evidence. For example, with respect to the assault and battery related to the defendant pushing the victim into the crib, a police officer described the broken crib in the apartment that the victim said had collapsed during the altercation. With respect to the assault and battery related to the defendant biting the victim's hand, one nurse testified to observing a bite mark, a second nurse and police officer described seeing wounds on the victim's hand, and the defendant admitted he had bitten the victim. With respect to the assault and battery related to the defendant punching the victim in the face, three witnesses testified to the cut on the victim's left eye, police observed what appeared to be blood on the wall in the apartment where the victim said the incident occurred, and the defendant admitted he saw the victim bleeding after their dispute. In addition, photographs of the victim's injuries were admitted in evidence, providing the jury with their own ability to assess whether they corroborated the victim's account of how the injuries occurred.
In these circumstances, the conclusory references that were somewhat buried in the medical records would not have offered any information that the jury did not already have. Moreover, that the jury did not rely on the challenged language is bolstered by their acquittal of the defendant on the rape charge despite the inclusion in the medical records of the "primary diagnosis" being "adult sexual assault." See Commonwealth v. Dargon, supra at 396-398 (errors in failing to redact more portions of medical record did not materially influence verdict).
b. Interpreter. At trial, defense counsel reported to the judge that the defendant's family members had approached her during a break in the victim's testimony to tell her that the interpreter was inaccurately translating the testimony, a point counsel was sensitive to because she knew some French and had noticed a deviation herself.[3] Counsel, however, reported no specific misinterpretation to the judge. In response, the judge instructed the interpreter to translate "very closely to what the witness is saying and be mindful of any expansion on it."
On appeal, the defendant focuses on several areas of the victim's testimony that he claims were misinterpreted by the Haitian translator and argues that counsel was ineffective for failing to seek a new interpreter or alternatively, a mistrial.[4] We agree with the judge, who carefully considered each allegation in detail, that there was no material information mistranslated and any errors did not prejudice the defendant.[5] See Commonwealth v. Festa, 369 Mass. 419, 429 (1976) (imperfections in translation may arise with use of interpreter under even best of circumstances). We agree with the judge that counsel was not ineffective in failing to obtain a new interpreter or to request a mistrial, where none of the purported errors deprived the defendant of an otherwise available defense. Commonwealth v. Morales, 440 Mass. 536, 549-550 (2003) (trial counsel not ineffective for failing to move for mistrial where request would have been futile).
c. Curative instruction. The defendant's claim that counsel was ineffective for failing to seek a curative instruction after his outburst at trial fails to show, as is required, that counsel's strategy was manifestly unreasonable. See, e.g., Commonwealth v. Long, 476 Mass. 526, 529 (2017). Here, counsel testified that she believed the outburst was advantageous to the defense as showing genuine human emotion, particularly because the outburst was not violent but "more of a pleading." Nor was it ineffective for counsel to forgo a curative instruction given the risk that it may have only emphasized the outburst. See Commonwealth v. Santiago, 458 Mass. 405, 413 (2010).
2. Missing witness instruction. The defendant has not established, as he must to prevail, that the judge abused her discretion in denying his request for a missing witness instruction with respect to the victim's mother. See, e.g., Commonwealth v. Williams, 475 Mass. 705, 721 (2016). The evidence showed that the victim's mother may have been on the telephone when the defendant pushed the victim into the crib and then shortly thereafter, when the defendant told her that he would break anyone who came to the house. Because her testimony offered nothing of "distinct importance" to the case, the judge did not abuse her discretion in denying the defendant's request. Once the judge did so, "counsel [was] not permitted to argue the issue in closing." Ibid.
3. Cross-examination of the defendant. Contrary to the defendant's argument, the prosecutor's cross-examination of the defendant did not exceed permitted bounds merely because she included the victim's version of the facts in her leading questions to the defendant. We agree with the Commonwealth that the questioning was no more than vigorous cross-examination and appears more likely "designed to serve the proper purpose of 'elicit[ing] an explanation of differences from prior testimony,' " Commonwealth v. Dickinson, 394 Mass. 702, 707 (1985), quoting from Commonwealth v. Donovan, 17 Mass. App. Ct. 83, 88 (1983), rather than "transform[ing] the interrogation stage of the trial into the phase traditionally reserved for argument and summation." Commonwealth v. Long, 17 Mass. App. Ct. 707, 709-710 (1984). Given that the jury acquitted the defendant of most of the charges, it is clear that the questioning was not unfairly prejudicial.[6]
Judgments affirmed.
Order denying motion for new trial affirmed.

Those charges include rape, assault by means of a dangerous weapon (knife), and two counts of threat to commit a crime, occurring between May 3 and May 4, 2011; two counts of assault and battery occurring on February 18, 2011; assault and battery, assault by means of a dangerous weapon (tire iron), and threat to commit a crime, all occurring on April 22, 2011; three counts of assault and battery occurring on April 25, 2011; and assault and battery and assault by means of a dangerous weapon (knife) occurring on April 26, 2011.

The proceedings were translated by a court certified Haitian interpreter who was sworn, as is required, prior to commencing work. G. L. c. 221C, § 4 (interpreter must "affirm that he will make true and impartial interpretation using his best skill and judgment in accordance with the standards prescribed by law and the ethics of the interpreter profession").

The defense hired an interpreter to listen to the audio recording of the trial testimony in conjunction with reading the original transcript, and to produce a revised transcript showing the discrepancies. At the hearing on the motion for a new trial, the interpreter testified.

We therefore reject the defendant's contention that counsel's decision to forgo a request for a new interpreter was inadvertent rather than intentional.

We also reject the defendant's challenge to the cross-examination of the defense witness. It is evident that the prosecutor was properly trying to elicit the fact that the witness, the defendant's "best friend," had spoken to the defendant since the incident but that they had not discussed the criminal case. Contrary to the defendant's argument, the prosecutor had no reason to believe that the defendant's best friend would nonresponsively state that the defendant had been in jail after the incident, and the judge immediately struck the nonresponsive statement. See Commonwealth v. Remedor, 52 Mass. App. Ct. 694, 706 (2001) (jury presumed to follow judge's instruction to disregard struck testimony).